IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MANUFACTURING RESOURCES INTERNATIONAL, INC., | ) ) ) | Redacted: Public Version |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 17-269-RGA |
| CIVIQ SMARTSCAPES, LLC, CIVIQ HOLDINGS, LLC, COMARK, LLC, and COMARK HOLDINGS, LLC, | ) ) ) ) | |
| Defendants. | ) | |

**DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT AND TO EXCLUDE CERTAIN EXPERT TESTIMONY**

OF COUNSEL:
Douglas J. Kline
Srikanth K. Reddy
Molly R. Grammel
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1209

Naomi Birbach
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
(212) 813-8800

Yuval H. Marcus
Cameron S. Reuber
Matthew L. Kaufman
Lori L. Cooper
LEASON ELLIS LLP
One Barker Avenue, Fifth Floor
White Plains, NY 10601
(914) 288-0022

Dated: April 22, 2019

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendants*

# TABLE OF CONTENTS

**INTRODUCTION AND SUMMARY OF THE ARGUMENT** ...................................... 1

**NATURE AND STAGE OF PROCEEDINGS AND RECITATION OF FACTS** ................ 2

**ARGUMENT – DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT** ................................................................................................ 4

I.     NO GENUINE DISPUTE OF MATERIAL FACT PRECLUDES ENTRY OF JUDGMENT THAT THE '322 AND '325 PATENTS ARE NOT INFRINGED ............ 4

    A.     Claim 7 of the '322 Patent Is Not Infringed Literally or under the Doctrine of Equivalents Because ███████████████████████████████ ██████████████ ........................................................................................ 4

    B.     Claims 1 and 2 of the '325 Patent Are Not Infringed Because ██████████ █████████████ ................................ 8

II.    NO GENUINE DISPUTE OF MATERIAL FACT PRECLUDES ENTRY OF JUDGMENT THAT THE ASSERTED CLAIMS IN THE '287 PATENT LACK SUFFICIENT WRITTEN DESCRIPTION .................................................... 10

III.   THE COURT SHOULD GRANT SUMMARY JUDGMENT OF NO PRE-NOTICE DAMAGES FOR THE '322, '595, '287, '325 AND '633 PATENTS BECAUSE MRI CANNOT SATISFY ITS BURDEN TO PROVE THAT IT COMPLIED WITH ITS MARKING OBLIGATIONS AND IT FAILED OTHERWISE TO PROVIDE ACTUAL PRE-SUIT NOTICE OF INFRINGEMENT ................................................ 12

    A.     MRI Cannot Prove Marking ..................................................................... 12

    B.     MRI Is Not Entitled to Damages Before Actual Notice .............................. 15

**ARGUMENT – DEFENDANTS' *DAUBERT* MOTIONS** ...................................... 16

I.     *DAUBERT* ARGUMENT 1: THE COURT SHOULD EXCLUDE ALL DAMAGES OPINIONS FROM MRI'S DAMAGES EXPERT MS. BENNIS ................................ 17

    A.     Ms. Bennis's Calculation of MRI's Allegedly Lost Profits Relies Entirely on ████████████████████████████████████████████ ... 18

    B.     Ms. Bennis Has Not Shown that, "But For" the Alleged Infringement, MRI Would Have Realized Lost Profits Encompassing All of Civiq's Profits on the Entire Link Kiosk as a Mere Supplier ............................................ 21

    C.     Ms. Bennis Has Not Identified Proper Evidence of Demand for the Patented Products to Satisfy *Panduit* Factor 1 for Lost Profits .......................... 25

    D.     Ms. Bennis's Reasonable Royalty Rate Calculation Lacks any Reasoned Economic Basis and Should be Excluded ............................................ 27

    E.     Because Ms. Bennis Cites No Evidence that the Patented Features Drive Demand for the Accused Products, Her Opinion that the Entire Market Value Rule Applies to the Royalty Base Here Should be Excluded .................... 31

i

II.     *DAUBERT* ARGUMENT 2: DR. SILZARS'S AND MS. BENNIS'S OPINIONS
        CONCERNING NON-INFRINGING ALTERNATIVES SHOULD BE
        EXCLUDED ............................................................................................................... 34

        A.      Opinions Regarding "Acceptability" That Are Based Solely on Personal
                Beliefs and Speculation Should be Excluded ......................................................... 34

        B.      Opinions that Rely on the Incorrect Legal Standard for "Availability"
                Should be Excluded .............................................................................................. 36

III.    *DAUBERT* ARGUMENT 3:  THE COURT SHOULD EXCLUDE CERTAIN
        ADDITIONAL TESTIMONY FROM MRI'S TECHNICAL EXPERT DR.
        SILZARS ................................................................................................................... 38

        A.      Dr. Silzars's Opinions Regarding Secondary Considerations Should be
                Excluded .............................................................................................................. 38

        B.      Dr. Silzars's Infringement Opinion as to the Hyundai Products Should be
                Excluded .............................................................................................................. 40

        **CONCLUSION** ............................................................................................................... 40

## TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Affiliated Mfrs., Inc. v. Aluminum Co. of Am.*,
    56 F.3d 521 (3d Cir. 1995).................................................................................19, 21

*Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*,
    811 F.3d 1334 (Fed. Cir. 2016)..........................................................................7, 8

*Alarm.com, Inc. v. SecureNet Techs. LLC*,
    C.A. No. 15-807, 2019 WL 133228 (D. Del. Jan. 8, 2019)...................................36

*Am. Med. Sys., Inc. v. Med. Eng'g Corp.*,
    6 F.3d 1523 (Fed. Cir. 1993)............................................................................12

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..........................................................................................4

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
    876 F.3d 1350 (Fed. Cir. 2017).........................................................................13

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
    598 F.3d 1336 (Fed. Cir. 2010).........................................................................11

*Arthur A. Collins, Inc. v. N. Telecom Ltd.*,
    216 F.3d 1042 (Fed. Cir. 2000)..........................................................................7

*AVM Techs., LLC v. Intel Corp.*,
    C.A. No. 10-610, 2013 WL 126233 (D. Del. Jan. 4, 2013)...............................32, 34

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
    616 F.3d 1249 (Fed. Cir. 2010).........................................................................10

*BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*,
    1 F.3d 1214 (Fed. Cir. 1993)...........................................................................25, 27

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
    C.A. No. 15-152, 2018 WL 4691047 (D. Del. Sep. 28, 2018) ..........................23, 25

*Calico Brand, Inc. v. Ameritek Imports, Inc.*,
    527 F. App'x 987 (Fed. Cir. 2013) ...................................................................26

*Cave v. Saxon Mortg. Servs., Inc.*,
    C.A. No. 12-5366, 2015 WL 6153754 (E.D. Pa. Oct. 20, 2015)..........................37

*Comcast IP Holdings I, LLC v. Sprint Commc'ns Co. L.P.*,
    C.A. No. 12-205, 2015 WL 4730899 (D. Del. Aug. 10, 2015) .........................32, 33

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993)..........................................................................................16, 37

*ECEM European Chem. Mktg. B.V. v. Purolite Co.*,
    451 F. App'x 73 (3d Cir. 2011) ................................................................................2, 21

*EMC Corp. v. Pure Storage, Inc.*,
    154 F. Supp. 3d 81 (D. Del. 2016).................................................................................36

*Schneider ex rel. Estate of Schneider v. Fried*,
    320 F.3d 396 (3d Cir. 2003).........................................................................................16

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*,
    879 F.3d 1332 (Fed. Cir. 2018)........................................................................28, 30, 31

*Gen. Mills, Inc. v. Hunt-Wesson, Inc.*,
    103 F.3d 978 (Fed. Cir. 1997)........................................................................................7

*Grain Proc. Corp. v. Am. Maize-Prod. Co.*,
    185 F.3d 1341 (Fed. Cir. 1999)................................................................................36, 37

*Immersion Corp. v. HTC Corp.*,
    C.A. No. 12-259, 2015 WL 834209 (D. Del. Feb. 24, 2015) ....................................21, 23, 24

*Inline Connection Corp. v. AOL Time Warner Inc.*,
    470 F. Supp. 2d 435 (D. Del. 2007).............................................................................19

*Inventio AG v. Thyssenkrupp Elevator Corp.*,
    C.A. No. 08-874, 2014 WL 5786668 (D. Del. Nov. 6, 2014) ..............................................39

*In re James Wilson Assocs.*,
    965 F.2d 160 (7th Cir. 1992) .......................................................................................17

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999)......................................................................................................16

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012)......................................................................18, 32, 34

*Magnetar Techs. Corp. v. Six Flags Theme Parks Inc.*,
    C.A. No. 07-127, 2014 WL 529983 (D. Del. Feb. 7, 2014) .......................................17, 39, 40

*Marino v. Indus. Crating Co.*,
    358 F.3d 241 (3d. Cir. 2004).........................................................................................4

*Ormco Corp. v. Align Tech., Inc.*,
    463 F.3d 1299 (Fed. Cir. 2006).....................................................................................39

iv

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
    575 F.2d 1152 (6th Cir. 1978) ................................................................. *passim*

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
    522 F.3d 1299 (Fed. Cir. 2008) ......................................................................11

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
    875 F.3d 1369 (Fed. Cir. 2017) .............................................................. *passim*

*Purdue Pharma L.P. v. Faulding Inc.*,
    230 F.3d 1320 (Fed. Cir. 2000) ......................................................................10

*Realtime Data, LLC v. Morgan Stanley*,
    554 Fed. App'x 923 (Fed. Cir. 2014) .............................................................12

*Rivera v. Int'l Trade Comm'n*,
    857 F.3d 1315 (Fed. Cir. 2017) ......................................................................11

*Siemens Mobility Inc. v. Westinghouse Air Brake Techs. Corp.*,
    C.A. No. 16-284, 2018 WL 7893901 (D. Del. Dec. 17, 2018) ........................13, 15

*Smith v. State Farm Fire & Cas. Co.*,
    164 F.R.D. 49 (S.D.W. Va. 1995) ...................................................................38

*Sonos, Inc. v. D & M Holdings Inc.*,
    297 F. Supp. 3d 501 (D. Del. 2017) ....................................................17, 35, 40

*Sprint Commc'ns Co. v. Cox Commc'ns Inc.*,
    302 F. Supp. 3d 597, 619 (D. Del. 2017) ...............................................37, 40

*Summit 6, LLC v. Samsung Elecs. Co.*,
    802 F.3d 1283 (Fed. Cir. 2015) ......................................................................16

*Universal Elecs., Inc. v. Universal Remote Control, Inc.*,
    34 F. Supp. 3d 1061 (C.D. Cal. 2014) .............................................................14

*Warsaw Orthopedic, Inc. v. NuVasive, Inc.*,
    778 F.3d 1365 (Fed. Cir. 2015) ......................................................................24

*XpertUniverse, Inc. v. Cisco Sys.*,
    C.A. No. 09-157, 2013 WL 865974 (D. Del. 2013) ..................................... *passim*

**Statutes**

35 U.S.C. § 287 .................................................................................12, 14, 15

v

**Other Authorities**

FED. R. CIV. P. 56(a) ................................................................................................................4

███████████████████████████████████████████████████

FED. R. EVID. 702 ................................................................................................16, 21, 23, 30

FED. R. EVID. 703 ................................................................................................................16

## TABLE OF ABBREVIATIONS

| Abbreviation | Full Description | Exhibit[1] or Docket Number |
|---|---|---|
| '287 Patent | U.S. Patent No. 9,629,287 (MRI00007863-MRI00007872) | 11 |
| '322 Patent | U.S. Patent No. 9,173,322 (MRI00007540-MRI00007557) | 4 |
| '325 Patent | U.S. Patent No. 9,173,325 (MRI00007558-MRI00007570) | 9 |
| ███████ ██ | ████████████████████ | 21 |
| ███████ █ | ████████████████████ | 24 |
| ███████ ██ | ████████████████████ | 22 |
| Bennis Rpt. | Expert Report and Disclosure of Melissa A. Bennis, dated January 17, 2019 | 25 |
| Bennis Reply | Reply Expert Report and Disclosure of Melissa A. Bennis, dated March 11, 2019 | 26 |
| Bennis Tr. | Deposition transcript of Melissa Bennis, dated April 9, 2019 | 27 |
| Blonder Reb. | Rebuttal Expert Report of Dr. Greg E. Blonder, dated February 19, 2019 | 5 |
| ████ | ███████████████ | 20 |

[1] All references to Exhibit numbers herein indicate exhibits to the Declaration of Molly Grammel in Support of Defendants' Opening Brief in Support of their Motion for Summary Judgment and to Exclude Certain Expert Testimony.

| Abbreviation | Full Description | Exhibit[1] or Docket Number |
|---|---|---|
| Dec. 21, 2018 Letter from Kwak | Letter from James Kwak to Srikanth Reddy dated December 21, 2018 | 17 |
| Dec. 3, 2018 Email from Kwak | Email from James Kwak to counsel for Defendants with the subject "RE: Manufacturing Resources International, Inc. v. Civiq Smartscapes, LLC et al.," dated December 3, 2018 | 16 |
| Dunn Tr. Pt. 2 | Deposition transcript of William Dunn, Volume II, dated October 25, 2018 | 23 |
| FAC | First Amended Complaint | D.I. 84 |
| LinkNYC Franchise Agreement | The City of New York Department of Information Technology & Telecommunications Franchise Agreement for the Installation, Operation, and Maintenance of Public Communications Structures in the Boroughs of the Bronx, Brooklyn, Manhattan, Queens and Staten Island (CIVIQ0004403-CIVIQ0004473) | 1 |
| LinkNYC Supply Agreement | ██████████████████████████ (CIVIQ0117332-CIVIQ0117361) | 2 |
| MRI Resp. to Interrog. 16 | MRI's Objections and Responses to Defendants' Fourth Set of Interrogatories to Plaintiff (No. 16), dated April 23, 2018 | 14 |
| MRI Resps. to Interrogs. 19–25 | MRI's Objections and Responses to Defendants' Sixth Set of Interrogatories to Plaintiff (No. 19-25), dated November 19, 2018 | 28 |
| MRI Supp. Resps. to Interrogs. 6 & 7 | MRI's Supplemental Objections and Responses to Defendants' First Set of Interrogatories to Plaintiff (Nos. 6 and 7), dated July 6, 2018 | 3 |
| ████████ | ██████████████████████ (CIVIQ0254309-CIVIQ0254312) | 30 |

| Abbreviation | Full Description | Exhibit[1]  or Docket Number |
|---|---|---|
| Nov. 30, 2018 Email from Barnett | Email from DeAnna Barnett to counsel for Defendants with the subject line "17-cv-00269-RGA Manufacturing Resources International, Inc. v. Civiq Smartscapes, LLC et al - - MRI DOCUMENT PRODUCTION AND CONFIDENTIAL PRIVILEGE LOG," dated November 30, 2018 | 19 |
| Nov. 30, 2018 Email from Kwak | Email from James Kwak to counsel for Defendants with the subject line "RE: Manufacturing Resources International, Inc. v. Civiq Smartscapes, LLC et al.," dated November 30, 2018 | 18 |
| Nov. 30, 2018 Letter from Reddy | Letter from Srikanth K. Reddy to James Kwak, dated November 30, 2018 | 15 |
| Sharp Opening Rpt. | Opening Expert Report of Anthony Sharp, dated January 17, 2019 | 12 |
| Silzars Claim Chart | Exhibit 1: Detailed Infringement Claim Charts to the Opening Infringement Expert Report of Dr. Aris Silzars, dated January 17, 2019 | 6 |
| Silzars Infr. Rpt. | Opening Infringement Expert Report of Dr. Aris Silzars, dated January 17, 2019 | 7 |
| Silzars Infr. Reply | Reply Infringement Expert Report of Dr. Aris Silzars, dated March 9, 2019 | 8 |
| Silzars Invalidity Reb. | Rebuttal Validity Report of Dr. Aris Silzars, dated February 19, 2019 | 13 |
| Silzars NIA Rpt. | Rebuttal Report of Dr. Aris Silzars to the Report of Anthony Sharp Regarding Non-Infringing Alternatives, dated March 11, 2019 | 31 |
| Silzars Supp. Invalidity Reb. | Supplemental Rebuttal Validity Report of Dr. Aris Silzars, dated October 15, 2018 | 34 |
| Silzars Tr. Pt. 1 | Deposition transcript of Aris Silzars, dated March 27, 2019 | 10 |
| Silzars Tr. Pt. 2 | Deposition transcript of Aris Silzars, dated March | 33 |

| Abbreviation | Full Description | Exhibit[1] or Docket Number |
|---|---|---|
|  | 28, 2019 |  |
| Williams Tr. Pt. 1 | Deposition transcript of Dave Williams, dated October 15, 2018 | 29 |

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Defendants Civiq Smartscapes, LLC; Civiq Holdings, LLC; Comark, LLC; and Comark Holdings, LLC (collectively, "Civiq") bring these motions for partial summary judgment and to exclude certain testimony proffered by Plaintiff Manufacturing Resources International, Inc. ("MRI"). Civiq seeks partial summary judgment of non-infringement, invalidity, and no pre-notice damages on four grounds and seeks to exclude testimony from MRI's damages expert (Melissa Bennis) and technical expert (Dr. Aris Silzars) on four additional grounds.

Partial summary judgment should be entered because there is no disputed question of fact and no jury could return a verdict in MRI's favor on the four issues presented. Rather, on these matters, MRI pins its case on facts and arguments that are irrelevant or insufficient as a matter of law. For example, on two asserted patents, MRI presents infringement theories that are contrary to the explicit, clear claim language as construed by the Court. Similarly, MRI contends that another patent is not invalid for lack of written description based on a legal standard (that there is sufficient support because "[t]here is nothing confusing or vague about" the claim limitations) that has not been endorsed by any court. Finally, MRI's evidence that it complied with the marking statute is insufficient as a matter of law for at least two reasons. First, MRI has only presented evidence of marking as to, at most, two of the forty-six allegedly patented products that MRI has sold. Second, MRI's "virtual marking" website did not associate allegedly patented articles with the asserted patents.

This court should also exclude Ms. Bennis's opinions concerning lost profits and reasonable royalty damages. As an initial matter, Ms. Bennis determined the amount of MRI's allegedly lost profits by relying entirely on ███████████████████████████████ ████████████████████████████████████████████ █████████████████████████████████████████████. In the

Third Circuit, courts are instructed to  Because her opinion is premised solely on ▮▮▮▮▮▮▮▮▮▮▮▮, Ms. Bennis's lost profits calculation should be excluded.

Moreover, Ms. Bennis's lost profits and reasonable royalty opinions should also be excluded because the framework she used is not the product of reliable methods and analysis. Instead, Ms. Bennis's conclusory opinions are supported, in many cases, by nothing more than the uncorroborated beliefs of MRI employees.  There are at least dozens of instances in her report where she merely parrots the beliefs of MRI's owner or another MRI witness to support a position.  As this Court recognized in *XpertUniverse, Inc. v. Cisco Sys.*, C.A. No. 09-157, 2013 WL 865974 (D. Del. 2013), an expert's "unfiltered regurgitation of what other people told him . . . adds nothing and therefore is not helpful to a jury."  Here, this maxim demands exclusion of nearly all of Ms. Bennis's opinions as well as several opinions offered by Dr. Silzars.

Where MRI and its experts have not even tried to engage with, let alone satisfy, MRI's burden on several critical elements of its claims, these issues and testimony should not be allowed to reach the jury.  MRI may not use the mantle of expert testimony to act as a mouthpiece for the beliefs of MRI's owner and its employees.  This is not the proper product of an expert's knowledge, experience, or education, and will not help the jury in this case.

**NATURE AND STAGE OF PROCEEDINGS AND RECITATION OF FACTS**

Civiq Smartscapes, LLC sells "smart city" urban engagement products including outdoor digital kiosks.[2]  *See generally* http://www.civiqsmartscapes.com/.  MRI has accused Civiq's

---

[2] Comark LLC's business includes ruggedized display products that are not accused in this case. The other defendants (other than Civiq Smartscapes) likewise do not make any accused products.

products of infringing twenty-one patents over the course of this case.  MRI also has asserted

claims for false and deceptive trade practices, unfair competition, and trademark infringement.

*See* D.I. 1 (Complaint); D.I. 84 (FAC).  MRI has since dismissed its claims as to certain accused

products, fifteen patents, false and deceptive trade practices, unfair competition, and trademark

infringement.  *See* D.I. 83; D.I. 116; D.I. 168; D.I. 180.  Remaining in the case are MRI's claims

that Civiq's Link kiosk infringes six asserted patents[3] and that Civiq's Waypoint and

Pronto/QSR kiosks infringe the '595 and '322 patents.  ████████████████████████████

████████████████████████████████████████████████

     The Link kiosk is a double-sided smart city kiosk that has been deployed in large cities

including New York City (the "LinkNYC project") and London, that provides features and

services to the public including free Wi-Fi, free phone calls, including to 911 and 311, two

digital displays for providing information and advertising, cell phone charging, and an interactive

tablet computer.  *See* Ex. 1, LinkNYC Franchise Agreement; Ex. 2 LinkNYC Supply Agreement.

The Waypoint provides nearly all of the same features as the Link kiosk.

     MRI's six asserted patents claim specific configurations of fans, heat sinks, and air

chambers that may be used to cool digital display faces placed in an outdoor environment.  *See*

*generally* D.I. 1; D.I. 84.  Unlike Civiq, MRI primarily sells display assemblies that are mounted

into varying structures like taxi hoods and the front door of convenience store refrigerators.  *See*

https://mri-inc.net/boldvu-vehicle-top-lcd-displays/; D.I. 84 ¶ 101.  MRI asserts that the patented

technology is incorporated into an LCD display assembly, also referred to as a public display

module, or "PDM."  *See infra* at p. 22.  MRI's PDM products are ████████████████████████

---

[3] U.S. Patent Nos. 8,854,595 ("the '595 patent"); 9,173,322 ("the '322 patent"); 8,854,572 ("the '572 patent"); 8,773,633 ("the '633 patent"); 9,629,287 ("the '287 patent"); and 9,173,325 ("the '325 patent") (collectively, the "asserted patents" or "patents-in-suit").

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████    *See* Ex. 3, MRI Supp.

Resps. to Interrogs. 6 & 7 at 3–4.

## ARGUMENT – DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

Summary judgment is appropriate where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a).  There is no issue for trial unless there is sufficient evidence favoring the

nonmoving party for a jury to return a verdict for that party.  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 249 (1986).  In considering a motion for summary judgment, a district court may

not make credibility determinations or engage in any weighing of the evidence, and must view

the evidence in a light most favorable to the non-moving party.  *Marino v. Indus. Crating Co.*,

358 F.3d 241, 247 (3d. Cir. 2004).

## I.    NO GENUINE DISPUTE OF MATERIAL FACT PRECLUDES ENTRY OF JUDGMENT THAT THE '322 AND '325 PATENTS ARE NOT INFRINGED

### A.    Claim 7 of the '322 Patent Is Not Infringed Literally or under the Doctrine of Equivalents Because ███████████████████████

No accused product infringes claim 7—the sole asserted claim in the '322 patent—

because none ███████████████████████████████████████

██████████████████████████████    Claim 4, from which claim 7 depends,

describes an LCD comprising: "a liquid crystal stack; a backlight assembly behind the liquid

crystal stack and comprising: a printed circuit board (PCB) having front and back sides; a

plurality of LEDs mounted on the front side of the PCB; a posterior surface on the rear side of

the PCB; a constricted convection plate placed behind and substantially parallel with the

4

posterior surface of the PCB; and a fan positioned to draw air between the constricted convection

plate and the posterior surface." Ex. 4, '322 patent at claim 4.  This Court construed the term

"between" to mean "in the space that separates."  D.I. 150 at 9–10.

It is undisputed that the accused products include ███████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████ █████████████

████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

████████████████████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████

<sup>4</sup> Dr. Silzars provides his infringement opinions in an attached claim chart rather than in the body
of his report.  *See* Ex. 7, Silzars Infr. Rep. ¶ 2.

5



Ex. 5, Blonder Reb. ¶¶ 60, 62–63.

No reasonable jury could return a verdict in MRI's favor based on its infringement position.  MRI contends that the ████████████████████████████████████

███████████████████████ Ex. 6, Silzars Claim Chart at 37–38, 46–47, 53, 56, 62–63.  MRI's interpretation is foreclosed by the context and literal language of the claim, which requires that the ██████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

███████████████████████████████

██████████████████████████████████████

███████████████████████████████████

█████████████████████████████████

███████████████████████████████████

██████████████████████████████

MRI cannot satisfy its burden to show infringement.  MRI's only "evidence" that the accused products infringe the claim ███████████████████████████

███████████████████████████ is Dr. Silzars's *ipse dixit*.  Ex. 8, Silzars Infr. Reply ¶¶ 31, 70, 83, 92, 98.  Dr. Silzars asserts that ████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

6

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████       Ex. 8, Silzars Infr. Reply ¶ 31 (emphasis added).  Dr. Silzars's "unsupported

assertion" that this limitation is met falls short of a genuine issue of material fact.  *Arthur A.*

*Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1046 (Fed. Cir. 2000).  MRI's literal

infringement claim thus fails as a matter of law.  *See Gen. Mills, Inc. v. Hunt-Wesson, Inc.*, 103

F.3d 978, 983 (Fed. Cir. 1997) ("Where the parties do not dispute any relevant facts regarding

the accused product . . . but disagree over possible claim interpretations, the question of literal

infringement collapses into claim construction and is amenable to summary judgment.").

The accused products also do not infringe claim 7 of the '322 patent under the doctrine of

equivalents, and the Court should reject the conclusory opinion of MRI's expert as a matter of

law.  *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334 (Fed. Cir. 2016) is instructive.

There, patentee's expert stated that the accused devices "perform the same function (maintaining

the pressure) and achieve the same result (maintaining sufficient pressure to prevent boiling of

the aqueous medium) in substantially the same way (collecting the dispersed material in a

contained volume)" as the claimed limitation.  *Id.* at 1343.  This "broad and scant" opinion could

not prevent summary judgment, as it was not only unduly conclusory but also failed to address

"how the differences between" the claim and alleged equivalent were "insubstantial."  *Id.*

MRI commits the same error as the patentee in *Akzo*.  In his opening infringement report,

Dr. Silzars provided only the conclusory statement that ███████████████████████████

████████████████████████████████████████████████████   for claim 7 of the

7

'322 patent "under the doctrine of equivalents as it performs the same function, in the same way, to achieve the same result."  Ex. 6, Silzars Claim Chart at 37, 47, 53, 56, 62–63.  Dr. Silzars's reply report is no better, stating only, without explanation, that in the accused devices, "the █ █████████████████████████████████ performs the function of acting as the █████ ███████████████████ with the same result (███████████████████████████████ █████████████████████████████████) in the same way (█████████████████)." Ex. 8, Silzars's Infr. Reply ¶¶ 32, 71, 84, 92, 99.  Putting aside the substantive issues (e.g., rendering the "function" part of the test a nullity by asserting that the function of the limitation is "acting as" the limitation), Dr. Silzars's conclusory statements require the same result as in *Akzo* because MRI ignores the differences between the alleged equivalent and the claim limitation, and proffers only Dr. Silzars's *ipse dixit* that the function-way-result test is met.

**B.    Claims 1 and 2 of the '325 Patent Are Not Infringed Because** █████ ███████████████████████████████████

The Link kiosk does not infringe any asserted claim of the '325 patent because it lacks ████ █████████████████████████████████████████████████████████████ ████████████████████████"[5]  Alternatively, under MRI's strained infringement theory, the Link kiosk lacks ████████████████████████████████████

The '325 patent is directed to an electronic display comprised of two back-to-back electronic image assemblies, each of which is surrounded by a "closed gaseous loop."  Ex. 9, '325 patent at Abstract.  Asserted claims 1 and 2 require "a first closed gaseous loop encircling the first image assembly," "a second closed gaseous loop encircling the second image assembly," a heat exchanger, and "a circulating fan assembly positioned to force circulating gas through the

[5] MRI has not asserted that the Link kiosk infringes under the doctrine of equivalents.

8

first gaseous loop, second gaseous loop, and heat exchanger."[6]  *Id.* at claims 1, 2.  There is no

dispute that the claim requires ██████████████████████

The structure and functionality of the Link Kiosk's ████████████ undisputed.

████████████████████████████████████████████████████.  Ex. 6,

Silzars Claim Chart at 175; Ex. 5, Blonder Reb. ¶ 52; *see also* Ex. 10, Silzars Tr. Pt. 1 at 165:9–

23.  Nevertheless, MRI contends the Link kiosk *literally* infringes claims 1 and 2, arguing that

████████████████████████████████████████████████████████

████████████████████████████████████████████  Ex.

8, Silzars Infr. Reply ¶ 25; Ex. 6, Silzars Claim Chart at 175–76.  The mere fact that ██████

██████████████ cannot support infringement, since the claims require ████████████

██████████████████████.  Ex. 9, '325 patent at

claims 1, 2.

Nor does the fact that ██████████████████████████████

demonstrate infringement since ██████████████████████  Even if ████████

████████████████████████████████████████████

████████████, this would mean that the Link kiosk does not include ██████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

██████████████████████████████

[6] The term "closed gaseous loop" was construed as "gas pathway within a display housing containing gas that is essentially isolated from external air."  D.I. 150 at 8.



*See* Ex. 8, Silzars Infr. Reply ¶ 25.  There cannot be any dispute that ████████████ ████████████████████ under Dr. Silzars's interpretation.  *See id.*  As a result, if MRI is correct that ████████████████████████████████ ██████████████, no reasonable jury could find that the Link kiosk includes ████ ██████████████████████████████ required by the '325 patent since ██████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████████ █████████████████████████

## II. NO GENUINE DISPUTE OF MATERIAL FACT PRECLUDES ENTRY OF JUDGMENT THAT THE ASSERTED CLAIMS IN THE '287 PATENT LACK SUFFICIENT WRITTEN DESCRIPTION

A POSA cannot conclude that the inventor of the '287 patent had possession of each limitation in the asserted claim of the patent.  Specifically, the patent specification lacks any written description of the claimed "rear cooling chamber . . . containing an electrical component which is electrically connected to the electronic display."  Ex. 11, '287 patent at claim 18.  Indeed, as MRI concedes, there is no disclosure of an "electrical component" contained in a "rear cooling chamber" in the specification.  As a result, summary judgment of invalidity is proper.

A POSA "must" be able to "immediately discern the limitation at issue in the claims" in the specification.  *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1323 (Fed. Cir. 2000).

The written description "test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to [a POSA] that the inventor had possession of the claimed subject matter." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010).  If "the claimed invention does not appear in the specification," the claim "fails regardless whether [a POSA] could make or use the claimed invention." *Id.* at 1348.  What matters is what is found in "the four corners of the specification." *Id.* at 1351.  This question "is amenable to summary judgment in cases where no reasonable fact finder could return a verdict for the non-moving party." *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008).

Claim 18 of the '287 patent requires an electronic display assembly comprising a "rear cooling chamber . . . containing an electrical component which is electrically connected to the electronic display."  Ex. 11, '287 patent at claim 18.  A POSA could not determine that the inventor possessed the claimed "rear cooling chamber . . . containing an electrical component which is electrically connected to the electronic display" based on the disclosure in the specification.  *See* Ex. 12, Sharp Opening Rpt. ¶ 441.  Dr. Silzars concedes that this limitation is not disclosed in the specification; the only disclosure is in Claim 18 itself.  Ex. 13, Silzars Invalidity Reb. ¶¶ 416–418; *Cf.* Ex. 11, '287 patent at 4:4–5:64 (describing the "rear cooling chamber" without mentioning the electrical component).

While Dr. Silzars asserts the claim cannot be invalid because "[t]here is nothing confusing or vague about" this claim limitation (Ex. 13, Silzars Invalidity Reb. ¶ 420), this does not explain where a POSA would find evidence in the specification showing possession of this limitation.  Dr. Silzars's conclusory assertions—in light of his admission that there is nothing in the specification that describes this limitation—are insufficient to raise a dispute of fact as to whether there is adequate written description. *See Rivera v. Int'l Trade Comm'n*, 857 F.3d 1315,

1322 (Fed. Cir. 2017) ("The knowledge of ordinary artisans may be used to inform what is actually in the specification, but not to teach limitations that are not in the specification, even if those limitations would be rendered obvious by the disclosure in the specification.").

Because no reasonable fact finder could find that the '287 patent inventors possessed the claimed rear cooling chamber "containing an electrical component which is electronically connected to the electronic display," summary judgment of invalidity of claim 18 should be granted.  *See, e.g. Realtime Data, LLC v. Morgan Stanley*, 554 Fed. App'x 923, 936 (Fed. Cir. 2014) (finding the patent lacked written description where the term "only appear[ed] in the claims themselves, which contain[ed] limited language and no descriptive content" and failed "to show that [Plaintiff] invented or had possession" of the invention).

### III.   THE COURT SHOULD GRANT SUMMARY JUDGMENT OF NO PRE-NOTICE DAMAGES FOR THE '322, '595, '287, '325 AND '633 PATENTS BECAUSE MRI CANNOT SATISFY ITS BURDEN TO PROVE THAT IT COMPLIED WITH ITS MARKING OBLIGATIONS AND IT FAILED OTHERWISE TO PROVIDE ACTUAL PRE-SUIT NOTICE OF INFRINGEMENT

#### A.   MRI Cannot Prove Marking

A patentee must "mark" its patented products in order to provide constructive notice of infringement.  35 U.S.C. § 287.  Products can be marked either "by fixing thereon the word 'patent'" either "together with the number of the patent," (physical marking) or "together with an address of a posting on the Internet . . . that associates the patented article with the number of the patent" (virtual marking).  35 U.S.C. § 287(a).  If the patentee has not marked "substantially all of its patented products" in one of the ways permitted by the statute in a "substantially consistent and continuous" manner, it cannot be awarded damages for the period before it provided the defendant with actual notice of infringement.  *Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1537–38 (Fed. Cir. 1993).

While the defendant bears an initial burden to identify the unmarked products it asserts were not properly marked, this is "a low bar" representing "a burden of production, not one of persuasion or proof." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1368 (Fed. Cir. 2017). The burden of proving compliance with the marking statute "is and at all times remains on the patentee." *Id.* at 1367, 1368. Summary judgment of no damages prior to actual notice is appropriate where the patentee "cannot meet its burden to prove" this compliance. *See Siemens Mobility Inc. v. Westinghouse Air Brake Techs. Corp.*, C.A. No. 16-284, 2018 WL 7893901, at *5 (D. Del. Dec. 17, 2018).

Here, no reasonable factfinder could conclude on the record evidence that "substantially all" of MRI's patented products were marked in a "substantially consistent and continuous" manner. MRI asserts that a number of its products embody the asserted patents. *See* Ex. 14, MRI Resp. to Interrog. 16 at 2–7 (listing the "MRI products" that "practice the asserted claims of the Patents-in-suit"). Civiq identified each of these products as "an unmarked patented article[]" subject to" the marking statute, and requested an identification of the evidence MRI contends "satisfie[s] its burden under the marking" statute. Ex. 15, Nov. 30, 2018 Letter from Reddy at 2–3. In response, MRI[7] provided: (1) four photographs of labels that each identify a unique product number (only two of which correspond to patented products identified in its interrogatory responses), which labels refer either the URL "www.mri-inc.net/patents.asp" or "www.lg-mri.com/patents" (MRI00324237-MRI00324240), (2) two documents appearing to be printouts of a website listing "MRI LCD Display Patents" without reference to any specific

---

[7] While MRI has suggested Civiq was obliged to perform an "inspection" of MRI's products to confirm that they are marked (Ex. 16, Dec. 3, 2018 Email from Kwak) or otherwise "investigate the facts relating to MRI's marking of its products" (Ex. 17, Dec. 21, 2018 Letter from Kwak at 2), it is MRI that bears the burdens of persuasion and proof. *See Arctic Cat*, 876 F.3d at 1367.

product(s) (MRI00013422, MRI00013574), and (3) various screen captures from the "Wayback

Machine" depicting lists of patents associated with the URLs "lg-mri.com/patents," "lg-

mri.com:80/patents," "mri-inc.net/patents/,"  "www.mri-inc.net:80/patents.asp," and "mri-

inc./net/patents.asp" (MRI00324198–MRI00324236).  *See* Ex. 16, Dec. 3, 2018 Email from

Kwak (producing MRI00324237–MRI00324240); Ex. 18, Nov. 30, 2018 Email from Kwak

(identifying MRI00013422 and MRI00013574); Ex. 19, Nov. 30, 2018 Email from Barnett

(producing MRI00324198–MRI00324236); Ex. 17, Dec. 21, 2018 Letter from Kwak at 1–2

(summarizing the above-listed evidence as support for MRI's purported marking compliance).

Even assuming for the sake of summary judgment that each of these documents is authentic, no

reasonable factfinder could conclude from this evidence that MRI has substantially and

consistently marked substantially all of its patented products ███████████████.[8]

*See Universal Elecs., Inc. v. Universal Remote Control, Inc.*, 34 F. Supp. 3d 1061, 1096–97

(C.D. Cal. 2014) (patentee failed to mark as a matter of law where patentee failed to present

evidence that it marked certain product models, comprising at least 22% of its covered products).

     Furthermore, MRI's virtual marking websites fall facially short of the statute's

requirements.  To comply with the virtual marking requirement, a patentee must mark the

product "with an address of a posting on the Internet . . . *that associates the patented article with

the number of the patent*."  35 U.S.C. § 287(a) (emphasis added).  None of MRI's identified

webpages associates any of the allegedly patented products listed in response to Interrogatory 16

with any of the asserted patent numbers.  Indeed, the majority of MRI's identified webpages fail

to associate *any* products with *any* patent numbers.  *See* Ex. 18, Nov. 30, 2018 Email from Kwak

---

[8] While MRI identified ██████████████ in response to Interrogatory 16, ██ ████████
████████████████████████████████████████

at MRI00013422, MRI00013574; Ex. 19, Nov. 30, 2018 Email from Barnett at MRI00324198–
MRI00324236.  The few webpages that do refer to MRI products state without elaboration that
either "all MRI products are protected by MRI patents," that "certain MRI displays may be
covered" by a specific subset of listed patents, or provide other equally nonspecific statements
utterly failing to associate the █ "patented articles" identified in response to Interrogatory 16
with the "number of the" asserted patents as required by the statute.  *See* Ex. 19, Nov. 30, 2018
Email from Barnett at MRI00324233, MRI00324235, MRI00324231, MRI00324232.  As MRI
has no other evidence of marking and these webpages facially fail the virtual marking provisions
of 35 U.S.C. § 287, summary judgment of no constructive notice is appropriate.

### B.     MRI Is Not Entitled to Damages Before Actual Notice

As MRI has not adequately marked its products to provide constructive notice, it is only
entitled to damages beginning on the date it provided the defendant with actual notice of
infringement.  35 U.S.C. § 287(a).  "Actual notice" exists "when the recipient is informed of the
identity of the patent and the activity that is believed to be an infringement."  *Siemens*, 2018 WL
7893901, at *2 (quoting *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1470 (Fed.
Cir. 1997)).  The "notice must be of 'the infringement,' not merely notice of the patent's
existence," such that "[a]ctual notice requires the affirmative communication of a specific charge
of infringement by a specific accused product or device."  *Id.* (quoting *Amsted Indus. Inc. v.
Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994)).

The first dates on which MRI provided actual knowledge to Civiq of the "specific
charges of infringement" by the "specific accused products" in this case are summarized below.
Because the record evidence shows that MRI cannot satisfy its burden to prove constructive
marking, summary judgment of no damages before these actual notice dates is appropriate.

15

| Patent[9] | Accused Product(s) | Actual Notice Date | Notice Event |
|---|---|---|---|
| 8,854,595 | Pronto/QSR | 3/14/2017 | Original complaint filed (D.I. 1) |
| | Link kiosks | 5/24/2016 | Demand letter (D.I. 1 at Ex. G) |
| | Waypoint kiosks | 3/14/2017 | Original complaint filed (D.I. 1) |
| 9,173,322 | Pronto/QSR kiosks | 3/14/2017 | Original complaint filed (D.I. 1) |
| | Link kiosks | 5/24/2016 | Demand letter (D.I. 1 at Ex. G) |
| | Waypoint kiosks | 3/14/2017 | Original complaint filed (D.I. 1) |
| 8,773,633 | Link kiosks | 11/29/2017 | Notice of MRI's intention to amend Complaint (*see* D.I. 66 at 3) |
| 9,629,287 | Link kiosks | 11/29/2017 | Notice of MRI's intention to amend Complaint (*see* D.I. 66 at 3) |
| 9,173,325 | Link kiosks | 11/29/2017 | Notice of MRI's intention to amend Complaint (*see* D.I. 66 at 3) |

**ARGUMENT – DEFENDANTS' *DAUBERT* MOTIONS**

The Court must act as a "gatekeeper" to ensure "that an expert, whether basing testimony

upon professional studies or personal experience employs in the courtroom the same level of

intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*

*Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also Daubert v. Merrell Dow Pharm.*,

*Inc.*, 509 U.S. 579, 592–95 (1993).  Expert testimony must be qualified, reliable and fit the issues

in the case.  FED. R. EVID. 702; *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396,

404–05 (3d Cir. 2003).  Reliable expert testimony "must be based on 'the methods and

procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert

must have 'good grounds' for his or her belief."  *Schneider*, 320 F.3d at 104.  "[A] reasonable or

scientifically valid methodology is nonetheless unreliable where the data used is not sufficiently

tied to the facts of the case."  *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed.

Cir. 2015).  Expert opinion may rely on otherwise inadmissible evidence in the circumstances

described in Fed. R. Evid. 703, which nonetheless cannot be used as an end-run around other

---

[9] Asserted U.S. Patent No. 8,854,572 contains only method claims, and as such, is not part of this request for summary judgment.

16

evidentiary prohibitions.  *See In re James Wilson Assocs.*, 965 F.2d 160, 173 (7th Cir. 1992) (Under Rule 703, "the judge must make sure that the expert isn't being used as a vehicle for circumventing the rules of evidence.").

Expert testimony merely "constitut[ing] the unfiltered regurgitation of what other people told [the expert] . . . adds nothing and therefore is not helpful to a jury." *XpertUniverse, Inc. v. Cisco Sys., Inc.*, C.A. No. 09-157, 2013 WL 865974, at *3 (D. Del. Mar. 7, 2013).  Where an opinion "fails to provide any analysis of how [it] was determined, and merely contains conclusory statements," it is properly excluded.  *Magnetar Techs. Corp. v. Six Flags Theme Parks Inc.*, C.A. No. 07-127, 2014 WL 529983, at *6–*12 (D. Del. Feb. 7, 2014), *rpt. and rec. adopted*, 61 F. Supp. 3d 437; *Sonos, Inc. v. D & M Holdings Inc.*, 297 F. Supp. 3d 501, 511–12 (D. Del. 2017) (excluding opinion "not supported by reference to any evidence").

# I.  *DAUBERT* ARGUMENT 1: THE COURT SHOULD EXCLUDE ALL DAMAGES OPINIONS FROM MRI'S DAMAGES EXPERT MS. BENNIS

MRI's damages expert, Melissa Bennis, has offered the opinion that, if MRI's asserted patents are valid and infringed, then MRI is entitled to lost profits damages on Civiq's sales of the Link kiosk in New York City and a reasonable royalty on all other sales of the Link kiosk, Waypoint, and Pronto/QSR (or, alternatively, a reasonable royalty on all sales).[10]  As to lost profits, Ms. Bennis's analysis under *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978) is flawed for at least three independent reasons.  First, to calculate the amount of purported lost profits, Ms. Bennis improperly relies on information ████████ ████████████████████████████████████████████████████████████████

_____

[10] Curiously, MRI does not seek lost profits on Link kiosk sales made as part of the London InLinkUK program.  MRI has not explained why, but for Civiq's infringement, it would have sold the entire Link kiosk to Civiq for the LinkNYC project, but not the London project.

██████████████████████████████████ Second, Ms. Bennis improperly concludes, without sufficient support, that, but for Civiq's infringement, Civiq would have purchased the *entire* Link kiosk from MRI rather than merely the claimed display assembly and (as a supplier) would have been paid 100% of the price Civiq charged its ultimate customer. Third, Ms. Bennis's opinion that demand exists for the patented product under *Panduit* factor 1 is unsupported by any reliable evidence.

Ms. Bennis's reasonable royalty opinion should also be excluded because of fundamental flaws in her determination of the appropriate royalty rate and base.  First, her royalty rate was derived based on two independent calculations that are arbitrary and unsupported by the any evidence in this case.  Second, Ms. Bennis's opinion that the entire market value rule (EMVR) applies here is unsupported by any evidence that Civiq's use of the patented features drives demand for the accused products.

### A.   Ms. Bennis's Calculation of MRI's Allegedly Lost Profits Relies Entirely on ████████████████████████████████



To calculate MRI's alleged lost profits, Ms. Bennis relies on ████████████ ████████████████████████████ ████████████████████████████ ████████████████████████ Ms. Bennis's lost profits calculation relying on ██████ ████████████████████ should be excluded. ████████████████████████ ████████████████████████████ ████████████████████████ ████████████████████████



████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ MRI filed its complaint on

March 14, 2017.  D.I. 1.  ██████ ██████████████████████ ████████████

██████████████████████████ ████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

███ ████████████████████████████████████████████████████

████████████████████████ ███ ██████████████████████████

████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████ ████████ ███

████████████████████████████████████████████████████████

█████████████████████████████ █ ██████ ████████████

---

[REDACTED]

[REDACTED] throughout her reports Ms. Bennis relies on information [REDACTED]

[REDACTED] . *See* Ex. 25, Bennis Rpt. at 34, 44–45, 70; Ex. 26, Bennis Reply at 10.

For example, Ms. Bennis relies *solely* on information [REDACTED] Ex. 25, Bennis Rpt. at 44–46.  Ms. Bennis states that [REDACTED]

[REDACTED] ." *Id.* (emphasis added).  Ms. Bennis acknowledged that [REDACTED]

[REDACTED] *Id.* (emphasis added).  Ms. Bennis concedes [REDACTED]

[REDACTED] ." Ex. 27, Bennis Tr. at 173:1–11.  Thus, Ms. Bennis's lost profits calculation should be excluded because she relied solely on [REDACTED]

to calculate the amount of MRI's alleged lost profits.[12]

Ms. Bennis's lost profits analysis should be excluded. [REDACTED]

---

[REDACTED]

[12] Likewise, Ms. Bennis improperly relies on [REDACTED] to support her lost profits opinion.  For example, [REDACTED]

[REDACTED] Similarly, she opines that [REDACTED] evidences [REDACTED]

[REDACTED] *See, e.g.*, Ex. 25, Bennis Rep. at 34; Ex. 26, Bennis Reply at 10.

 . Ms. Bennis has admitted as much

regarding ██████████████ by stating that ███████████████████

████████████████████████████████████

████████████ . Ex. 25, Bennis Rpt. at 44. ████████████████████

████████████████████████████████████

████████████ . Ms. Bennis's lost profits calculation should be excluded, as she

effectively agreed that it would no longer be the product of reliable principles and methods under

Rule 702 without this evidence.  *See* Ex. 27, Bennis Tr. at 173:1–11.  Without Ms. Bennis's

opinion and the ██████████ on which it was based, MRI has no admissible evidence as to

*Panduit* Factor 4, "the amount of profit the patent owner would have made," 575 F.2d at 1156,

warranting entry of summary judgment of no lost profits if this opinion is excluded.

> **B.    Ms. Bennis Has Not Shown that, "But For" the Alleged Infringement,
> MRI Would Have Realized Lost Profits Encompassing All of Civiq's
> Profits on the Entire Link Kiosk as a Mere Supplier**

Ms. Bennis's lost profits opinion should also be excluded because, without supporting

economic evidence, Ms. Bennis assumes that "but for" Civiq's infringement, MRI would have

acted as an exclusive supplier to Civiq, selling not only MRI's patented display subcomponent

but the entire Link kiosk, and that Civiq would have remitted 100% of its sales revenue to MRI.

A lost profits award should not "include items that have essentially no functional

relationship to the patented invention and that may have been sold with an infringing device only

as a matter of convenience or business advantage."  *Immersion Corp. v. HTC Corp.*, C.A. No.

12-259, 2015 WL 834209, at *4 (D. Del. Feb. 24, 2015) (quoting *Rite–Hite Corp. v. Kelley Co.,*

56 F.3d 1538, 1550 (Fed. Cir. 1995)).  "A functional relationship does not exist when independently operating patented and unpatented products are purchased as a package solely because of customer demand."  *Id.* (quoting *Am. Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1268 (Fed. Cir. 2008)).  "If they can function independently, patented and unpatented products do not constitute a functional unit" for purposes of a lost profits analysis.  *Id.*

Ms. Bennis contends that, but for Civiq's infringement, it would have outsourced manufacturing of the "entire kiosk" for the LinkNYC project to MRI.  Ex. 27, Bennis Tr. at 122:2–5.  But Ms. Bennis does not provide any economic basis why Civiq would purchase the entire kiosk from MRI as opposed to only the patented subassembly.  *See* Ex. 26, Bennis Reply at 10 (citing ███████████████████████  █ a "discussion with Mr. Dunn" as the only support for conclusion that MRI would have sold the entire kiosk rather than a subassembly).

The absence of such a basis is critical because, while MRI does sell some kiosks, it also makes smaller salable products that incorporate the allegedly patented technology—to wit, LCD display assembly products that it sells for integration into customers' kiosks and structures.  MRI distinguished its smaller display assembly products and its full kiosks by explaining that ████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████  Ex. 28, MRI Resps. to Interrogs. 19–25 at 7; Ex. 29, Williams Tr. Pt. 1 at 186:6–188:20, 189:20–190:3 (explaining PDM offerings).  Ms. Bennis has not cited any economic evidence or reasoning for why MRI necessarily would have made sales of larger, more expensive kiosks in a "but for" world, instead of selling Civiq only the ███████████████  PDM display assembly.

Relevant here, a LinkNYC kiosk includes not only the LCD, cooling, and other electronic components ████████████████████, but also other features such as phone

22

calling, USB charging, WIFI and an interactive tablet computer.  *See* Ex. 2, LinkNYC Supply

Agreement at CIVIQ0117352–355.  Ms. Bennis admitted it was "possible" that MRI would have

produced something less than the full LinkNYC structure "and then turned it over, and Civiq or

someone else put a tablet on it."  Ex. 27, Bennis Tr. at 124:16–125:1.  But she provides no

economic justification for disregarding this possibility in her lost profits opinion.  Instead, she

decided that MRI would have made sales encompassing all of this additional value (and profit) in

the LinkNYC kiosk, based only on having been told by MRI's CEO that he "belie[ves] that MRI

would have provided the entire product," ████████████████████████████████████████

███████████████████████████████.[13]  Ex. 27, Bennis Tr. at 122:6–13; *see also id*

at 123:15–125:1; Ex. 26, Bennis Reply at 10.  The "unfiltered regurgitation" of another's opinion

(*XpertUniverse,* 2013 WL 865974, at *3), without economic basis, cannot stand as expert

economic opinion under Rule 702.  *See Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, C.A. No. 15-

152, 2018 WL 4691047, at *6 (D. Del. Sep. 28, 2018) (excluding a lost profits opinion regarding

the existence of a two-supplier market that was only supported by qualitative evidence).

Furthermore, these un-accused features in the LinkNYC kiosk (e.g., the tablet computer)

"can function independently" from the allegedly patented cooling system of the LinkNYC kiosk,

meaning it is inappropriate to include sales of the tablet or any other such features in a lost

profits analysis.  *Immersion Corp.*, 2015 WL 834209, at *4.  Not only has Ms. Bennis provided

no argument or evidence in support of such a "functional relationship," she also responded when

asked if "the thermal cooling features that are claimed in the asserted patents enable the tablet on

the side of the Link[NYC kiosk] to work as directed," that she did not know if this was her

---

[13] ██████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

opinion.  Ex. 27, Bennis Tr. at 185:11–24.  It is undisputed that ███████████████████

████████████████████████████████████████████  Ex. 30, ████████████████████  at

CIVIQ0254309.  Ms. Bennis's failure to justify including tablet sales in her lost profits opinion

with any evidence of such a "functional relationship" means that she has offered a "non-viable

lost profits legal theory" that should be excluded.  *Immersion Corp.*, 2015 WL 834209, at *4.[14]

Ms. Bennis's opinion is also flawed because it assumes, without explanation or economic

justification, that Civiq would have given MRI 100% of the sales revenues it receives from

CityBridge for sales of the Link.  It is fundamental that, to "recover lost profits, the patentee

bears the burden of proof to show a reasonable probability that, 'but for' infringement, it would

have made the sales" it identifies.  *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875

F.3d 1369, 1380 (Fed. Cir. 2017) (citations omitted).  Part of meeting this burden requires a

showing of "the amount of profit that would have been made."  *Id.*  Ms. Bennis attempts this by

first taking Civiq's average selling price of LinkNYC kiosks as sold to Civiq's ultimate

customer, CityBridge, and then subtracting MRI's incremental costs in supplying the LinkNYC

kiosks to Civiq.  Ex. 25, Bennis Rpt. at 43–44.  She thus concludes that, in the hypothetical

market, MRI would have realized profit amounting to the *entire difference* between Civiq's

average sales on the LinkNYC kiosks and MRI's cost of supplying the kiosks to Civiq.  *Id.* at 46.

Ms. Bennis's analysis does not show a "reasonable probability" that MRI would achieve

this result but for Civiq's alleged infringement.  Ms. Bennis assumes that Civiq would act as a

pass-through middleman *that receives no value* for its role in the LinkNYC project, merely

---

[14] *See also Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 778 F.3d 1365, 1375-76 (Fed. Cir. 2015), *vac'd on other grnds.*, 136 S. Ct. 893 (2016), *reinst'd in relev. part*, 824 F.3d 1344, 1346 (Fed. Cir. 2016) (reversing lost profits including sales of surgical parts sold in a "kit" with patented implant where patentee showed no evidence that unpatented parts had no independent function).

24

taking the kiosk sales price from CityBridge with one hand and passing 100% of this revenue to MRI with the other. Ms. Bennis makes no allowance for how Civiq would be able to enter into such an economic arrangement with a supplier in a but-for market and still keep the lights on. The notion of such an agreement is absurd on its face—a far cry from the "reasonable probability" necessary for lost profits damages. *Presidio*, 875 F.3d at 1380. As Ms. Bennis's lost profits analysis is divorced from any supporting economic analysis, it should be excluded. *Bio-Rad*, 2018 WL 4691047, at *6 (excluding lost profits opinion where expert's conclusion regarding existence of a two-supplier market was supported only by qualitative evidence).

In sum, Ms. Bennis's lost profits opinion is based on speculative assumptions about the parties' but-for relationship that have no economic or evidentiary basis. As such, this opinion should be excluded as neither the product of reliable principles nor based on sufficient facts. As above, without the excluded opinion, MRI has no evidence to support its lost profits claim under *Panduit* Factor 4, warranting entry of summary judgment of no lost profits.

### C.   Ms. Bennis Has Not Identified Proper Evidence of Demand for the Patented Products to Satisfy *Panduit* Factor 1 for Lost Profits

Ms. Bennis's lost profits opinion that the requisite demand exists for MRI's patented products under *Panduit* factor 1 relies on three categories of evidence that fail as a matter of law.

Under Factor 1 in the *Panduit* analysis, MRI must show "demand for the patented product." *See, e.g., Presidio*, 875 F.3d at 1380. Factor 1 "presupposes that demand for the infringer's and patent owner's products is interchangeable;" if this assumption is shown to be correct, then "evidence of sales of the infringing product may suffice to show *Panduit*'s first factor." *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1218–19 (Fed. Cir. 1993). But this "analysis assumes that the patent owner and the infringer sell substantially the same product"—if, by contrast, "the products are not sufficiently similar to compete in the same

25

market for the same customers," this assumption falls apart and demand for the allegedly

infringing product cannot satisfy *Panduit* Factor 1 as a matter of law.  *Id.* at 1219.

The evidence Ms. Bennis relies upon to show demand for the patented product required

under *Panduit* factor 1 is insufficient and irrelevant.  Ms. Bennis sets forth three purported bases

for demonstrating this demand:  (1) general digital signage demand trends from 2018; (2) MRI's

sales and profits for all of its products between 2013 and 2016, and (3) demand for the LinkNYC

kiosk.  Ex. 25, Bennis Rpt. at 30–34.  None of these is sufficient as a matter of law.

As to the first two bases, evidence regarding generalized demand for "digital signage"

products at large and MRI's total top-line sales for all of its products, regardless of what industry

these are sold into or whether they embody the patented technology, cannot show *Panduit*

demand for the *patented product*.  As a result of the Federal Circuit's "well-established

precedent requiring a causal relation between the infringement and its lost profits . . . demand for

[an] entire apparatus is, in most circumstances, not interchangeable with demand for a patented

component of the larger apparatus" under *Panduit* factor 1.  *Calico Brand, Inc. v. Ameritek

Imports, Inc.*, 527 F. App'x 987, 996 (Fed. Cir. 2013) (quotation marks omitted) (overturning

district court, noting that it was clear from summary judgment opinion that demand did not exist

under *Panduit* factor 1).  Here, MRI asserts that the patented features are contained within a

digital display subcomponent (referred to by MRI as a "PDM") that is one part of a smart city

kiosk.  *See supra* at p. 22.  At best, the generalized demand Ms. Bennis has suggested exists for

"digital signage" products and for MRI's aggregate, top-line sales numbers for all products fails

to distinguish between "demand for the entire apparatus" (a digital kiosk) and "demand for [the]

patented component" that MRI sells (the PDM), and should be excluded for this reason.  *Calico*,

527 F. App'x at 996; *see also* Ex. 27, Bennis Tr. at 75:3–18 (admitting general statements as to

industry demand are "not tied to kiosks" or even "to indoor . . . versus outdoor applications").

As to the third basis, evidence regarding demand for the Link kiosk cannot stand in for demand for the patented products where there is no evidence that the Link kiosk is "similar in price and product characteristics" to the patented products.  *BIC*, 1 F.3d at 1219.  No MRI expert has compared the Link kiosk's characteristics or price to MRI's patented products.  To the contrary, Ms. Bennis *distinguished* ███ ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████. Ex. 25, Bennis Rpt. at 40.  Ms. Bennis's own reasoning shows that the Link kiosks "are not sufficiently similar" to the patented products (and in other words, are not "substantially the same product")[15] to satisfy *Panduit* factor 1.

In short, Ms. Bennis's proffered evidence of demand for the patented product fails the legal requirements of *Panduit* factor 1, warranting exclusion of her opinions on this subject.

### D.    Ms. Bennis's Reasonable Royalty Rate Calculation Lacks Any Reasoned Economic Basis and Should be Excluded

Ms. Bennis's reasonable royalty opinion in this matter should be excluded because it is untethered to her analysis under the *Georgia Pacific* factors.  Ms. Bennis calculated her proposed royalty rate in this case by (1) starting from a prior agreement to two technologies relating to digital displays for a combined ███ rate, (2) arbitrarily apportioning ███ of this to the technology that was analogous to the patents-in-suit, and (3) arbitrarily doubling this ███ rate to arrive at ███ ███ proposed royalty rate.  There is no economic basis for Ms. Bennis's royalty calculation.

Last year, the Federal Circuit found an opinion provided by Ms. Bennis regarding the

---

[15] As a full kiosk, the LinkNYC is also not "substantially the same product" as MRIs PDMs. This is another reason LinkNYC demand cannot substitute for demand for MRI's products.

27

appropriate royalty rate to be so baseless that the district court not only erred in failing to exclude

her opinions, but also abused its discretion in denying a new trial on damages after her opinions

were introduced.  *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d

1332, 1349–51 (Fed. Cir. 2018).  The *Exmark* Court explained that, to "be admissible, expert

testimony opining on a reasonable royalty must 'sufficiently [tie the expert testimony on

damages] to the facts of the case.  If the patentee fails to tie the theory to the facts of the case, the

testimony must be excluded." *Id.* at 1349 (alteration in original) (citation omitted).  While

"mathematical precision is not required, some explanation of both why and generally to what

extent" the relevant facts and evidence "impact the royalty calculation is needed." *Id.* at 1350.

Although Ms. Bennis's opinion in *Exmark* made a preliminary showing of going through

the factors relevant to determining a royalty rate under *Georgia-Pacific* and discussing the

relevant evidence, its fatal flaw was that "[n]owhere in her report . . . did she tie the relevant

*Georgia-Pacific* factors to the 5% royalty rate" that she opined was reasonable in that case "or

explain how she calculated a 5% royalty rate using these factors." *Id.* at 1349.  Instead, "[a]fter a

discussion of each of the *Georgia-Pacific* factors," she merely "concluded with little explanation

that [the parties] would have agreed to a 5% reasonable royalty rate." *Id.*

This description parallels Ms. Bennis's report in this case, in which she likewise

discussed each *Georgia-Pacific* factor, but "did not explain how . . . her analysis of the *Georgia-

Pacific* factors[] led to her proposed ███ royalty rate." *Id.* at 1350; *see also* Ex. 25, Bennis Rpt.

at 54–78.  As described below, Ms. Bennis "concluded with little explanation" that the parties

here would have agreed to ███ royalty, without attempting to "tie" this opinion to "the

relevant *Georgia-Pacific* factors," "the facts of this case," or a single shred of "quantitative

market evidence."  879 F.3d at 1349–51.

28

In particular, two independent aspects of Ms. Bennis's calculation to arrive at her suggested royalty rate for this case are each untethered to the *Georgia-Pacific* factors, the facts of this case, or the evidence in the record.  While Ms. Bennis began by looking to a comparable license agreement (Ex. 25, Bennis Rpt. at 64–65), she made two unsupported assumptions to depart from that license, each of which independently infects her suggested ███ royalty rate in this case.  The relevant license agreement, ██████████████████████████████, provided for a ███ royalty rate to license two types of technology—the first, █████ ████████████████████████, is analogous to the technology claimed by the patents-in-suit and the second, ████████████████, is dissimilar.  *Id.* at 64.

Ms. Bennis's first error in extrapolating from the ████████████ is that she arbitrarily determined that ████████ of the ███ royalty in that agreement (i.e., a ███ royalty) can be apportioned to the ████████████ technology, without any evidence or facts to support this allocation.  *Id.* at 76.  She noted that "equal value assigned to each" technology "would suggest ███ might be assigned to each," but then opined without any citation or explanation whatsoever that she "understand[s] that . . . the more realistic split of" the license's ███ royalty "would be ███ to the ████ technology, to ██ to the ██████████ technology."  *Id.* Ms. Bennis did not even try to correlate this ████████████ split with any specific fact or evidence in this case, let alone explain *how* any such facts would suggest a ████████████ split as opposed to some other allocation.  *Id.*  When asked if she "perform[ed] any quantitative analysis" in her apportionment, she revealed that she based this opinion on having "talked [it] through" with Mr. Dunn, MRI's CEO, and taking into account his personal "understanding of how he would weigh" the two technologies in the ████████████.  Ex. 27, Bennis Tr. at 224:17–226:20.  This cannot stand as "reliable" economic analysis based on "sufficient facts or

29

data" under Rule 702 or *Exmark*.  Instead, it is an example of MRI's experts acting as uncritical mouthpieces for Mr. Dunn's personal beliefs.[16]  *See XpertUniverse,* 2013 WL 865974, at *3. The harm done by Ms. Bennis's unsupported apportionment is clear from an example:  had she used a 50-50 split instead and allocated ███████████ rate to the relevant technology, after doubling, her suggested rate for this case would have been ███ — lowering the total royalty damages on page 80 of her report by over ██████ .  Ex. 25, Bennis Rpt. at 80.

Ms. Bennis's second misstep in deriving her suggested reasonable royalty is opining without any basis that the royalty rate for this case would be double the portion of the ██████████ rate that is properly apportioned to the relevant technology.  *Id.* at 76–77.  This calculation should be excluded even if Ms. Bennis's decision to apportion ██████████████ rate to the relevant technology is admissible.  As the entire basis for doubling the apportioned ██████████████ rate to arrive at ██████ rate for this case, in a single sentence Ms. Bennis states (again, without any citation of any kind) that factors such as the difference in the number of patents subject of the agreement, the maturity of the patentee, and the relationship between the parties, "would sensibly drive at least double the royalty" for this case as "that which was provided ████████████████" *Id.*  Even assuming that these factors warrant increasing the ██████████ rate by *some* amount, Ms. Bennis has no explanation for why she multiplied that ██████ as opposed to any other number (for example, ████████████ ).  Indeed, when asked if it would "also be sensible" to multiply the ██████████ royalty rate by another number, Ms. Bennis replied that she did not know and that she had not "made that consideration."  Ex. 27, Bennis Tr. at 228:10–13.  In another example of the significant harm done by Ms. Bennis's arbitrary calculations, had she multiplied her apportioned ██████████████ rate █████ instead of

---

[16] Additional examples are discussed *infra* at pp. 34–35, 38–39.

████, her ultimate rate for this case would have been ████, reducing the royalty damages on page 80 of her report by nearly █████████.

While Ms. Bennis has discussed some "quantitative market evidence" in the sections of her report discussing the *Georgia-Pacific* factors, "even assuming she properly considered this record evidence, she failed to explain how the evidence factored into the proposed royalty rate." *Exmark*, 879 F.3d at 1351. As in *Exmark*, here "[s]he merely addressed the *Georgia-Pacific* factors in light of the facts and then plucked the" ████ apportionment of the ████████ royalty to the relevant technology and the subsequent decision to multiply this apportioned ██████ "out of nowhere." *Id.* Ms. Bennis has claimed that these calculations are generally supported by various factors, but she has never tried to explain *how* any of these factors lead to either a ████ ██████████ apportionment within the █████████ license or to multiplying that apportioned ██████ to reach the overall royalty rate in this matter. "It is not enough for an expert to simply assert that a particular royalty rate is reasonable in light of the evidence without tying the proposed rate to that evidence." *Id.* at 1351. As "experts must not only analyze the applicable factors, but also carefully tie those factors to the proposed royalty rate," Ms. Bennis's opinion regarding the reasonable royalty in this case should be excluded. *Id.* at 1350.

> **E.    Because Ms. Bennis Cites No Evidence that the Patented Features Drive Demand for the Accused Products, Her Opinion that the Entire Market Value Rule Applies to the Royalty Base Here Should be Excluded**

Ms. Bennis's decision to include the entire value of the accused kiosks in the royalty base fails to satisfy the entire market value rule (EMVR). As a result, her reasonable royalty analysis should be excluded.

The selection of an appropriate royalty base must consider how much of the accused product's value is attributable to the patented technology. The EMVR is a "narrow exception" to

31

the "require[ment] that royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit.'" *LaserDynamics*, 694 F.3d at 67.  The test for when a royalty base may include the entire value of a multi-component product "can only be met by showing that the patented feature alone causes customers to purchase the accused products." *AVM Techs., LLC v. Intel Corp.*, C.A. No. 10-610, 2013 WL 126233, at *2 (D. Del. Jan. 4, 2013).  "It is not enough to merely show that the [patented technology] is viewed as valuable, important, or even essential to the use of the" product.  *LaserDynamics*, 694 F.3d at 68.  *Cf. Comcast IP Holdings I, LLC v. Sprint Commc'ns Co. L.P.*, C.A. No. 12-205, 2015 WL 4730899, at *7 (D. Del. Aug. 10, 2015) ("Stating that patents are necessary to offer a service is not . . . the same as saying that a specific feature drives customer demand.").  Instead, the EMVR requires a showing that the patented "functionality is what motivates consumers to buy [the product] in the first place." *Id.*

At best, all Ms. Bennis has asserted to support her invocation of the EMVR is that adequate thermal management, such as that provided by the cooling technology of the patents-in-suit,[17] is necessary in order for an outdoor digital display screen to function.  *See* Ex. 25, Bennis Rpt. at 52–53.  Even if this were so, it is "not enough" to satisfy the EMVR "to merely show that the" patented technology is "essential to the use of the" product.  *LaserDynamics*, 694 F.3d at 68. To the contrary, if she is to properly include the entire value of Civiq's accused smart city kiosks in her royalty base, Ms. Bennis must first demonstrate that the patented technology "is what motivates consumers to buy [the kiosks] in the first place." *Id.*  She has not even attempted such

---

[17] Ms. Bennis's report is inconsistent regarding whether she thinks it is the *patented* cooling systems, or merely "thermal management" in general, that is necessary for an outdoor digital display product to function. *See, e.g.*, Ex. 25, Bennis Rep. at 53.  Notably, MRI has never asserted that its patents cover the *only* adequate thermal management system for such products. Regardless, even had Ms. Bennis consistently tied her opinion to the importance of the *patented* technology, her opinion would still fail to satisfy the EMVR for the reasons discussed herein.

a showing.  Indeed, Ms. Bennis concedes that the patented technology does *not* drive demand by acknowledging that "buyers of these products look for" various features including "power requirements" and "how the displays look in terms of clarity, brightness and luminance."  Ex. 25, Bennis Rpt. at 52–53.  Even if it were true that these features were "subject to the success of thermal management," as Ms. Bennis opines (*id.* at 53), this is not "the same as saying" that thermal management "drives customer demand."  *Comcast*, 2015 WL 4730899, at *7.

To the extent that MRI attempts to invoke a body of law permitting use of the EMVR where the unpatented features of the product are "simply generic and/or conventional and hence of little distinguishing character," she has presented no evidence or explanation for why that is the case here.  She opines without a single citation that ████████████████████ ███████████████████████████████████████ ████████████████████████████████████████████ ████████████  Ex. 25, Bennis Rpt. at 53.  This cannot be squared with her acknowledgement that customers are particularly interested in distinguishing features like ███████████████ █████████████████████████████  *Id.* at 52–53.  It is undisputed that ██████ ████████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████.  *See* Ex. 2, LinkNYC Supply Agreement at CIVIQ0117352–355.  Ms. Bennis has not acknowledged the existence of the majority of these components of Civiq's kiosk products, let alone explained how they are "simply generic and/or conventional and hence of little distinguishing character."

Even "[a]ssuming for the sake of argument that" the cooling system is "the single most important part of" Civiq's smart city kiosks, "it is still a long haul to conclude that" the cooling

33

systems "'drive demand' for the entire" kiosk. *AVM*, 2013 WL 126233, at \*3. At best, Ms.

Bennis asserts that the patented technology is "essential" to providing the features that customers

seek, and this is insufficient as a matter of law. *LaserDynamics*, 694 F.3d at 68. As a result, Ms.

Bennis's reasonable royalty opinion should be excluded for including the entire value of Civiq's

smart city kiosk products in the royalty base without demonstrating that the patented features

drive demand for the accused products.

## II.   *DAUBERT* ARGUMENT 2: DR. SILZARS'S AND MS. BENNIS'S OPINIONS CONCERNING NON-INFRINGING ALTERNATIVES SHOULD BE EXCLUDED

### A.   Opinions Regarding "Acceptability" That Are Based Solely on Personal Beliefs and Speculation Should be Excluded

MRI seeks lost profits based on purported expert testimony that the non-infringing

alternatives Civiq has identified would not be acceptable substitutes for MRI's products. But

these opinions should be excluded, as they are barren of any supporting evidence, relying merely

on unsubstantiated beliefs of MRI's CEO and Dr. Silzars.

To be entitled to lost profits, a patentee has the burden to establish "the absence of

acceptable, non-infringing alternatives," by proving "either that the potential alternative was not

acceptable to potential customers or was not available." *Presidio*, 875 F.3d at 1380.

In her lost profits opinion, Ms. Bennis has presented no independent analysis of whether

any non-infringing alternatives would be acceptable—she relies solely on "knowledge from Mr.

Dunn" (MRI's CEO) as to MRI's "belief" that it offered the only "acceptable" product, her lack

of awareness of contrary evidence, and MRI's interrogatory response regarding secondary

considerations. *See* Ex. 25, Bennis Rpt. at 35–37, 39. In her reply report, she additionally points

to Dr. Silzars's opinions on acceptability (which, as discussed below, should also be excluded)

and to the details of two technical documents on which she is not qualified to opine. *See* Ex. 26,

Bennis Reply at 5–8.  To the extent Ms. Bennis purports to have any opinions independent from Dr. Silzars as to the acceptability of the non-infringing alternatives, they should be excluded as "not supported by reference to any evidence," *Sonos*, 297 F. Supp. 3d at 511–12, other than the "unfiltered regurgitation of what other people told" her.  *XpertUniverse,* 2013 WL 865974, at *3.

As to Dr. Silzars, his conclusion that no non-infringing alternative would be acceptable should be excluded since it is nothing more than his uncorroborated personal belief regarding the inferiority of these products.  In particular, Dr. Silzars contends that any proposed non-infringing alternative that leverages ambient air cooling with a filter (e.g., ██████████████████████████

██████) is unacceptable *per se*.[18]  Ex. 31, Silzars NIA Rpt. ¶ 25 ("[I]t is questionable in my opinion whether an outdoor display utilizing only ambient air over filters would perform satisfactorily.").  But Dr. Silzars's belief in this respect is unsupported by any citation to any document or evidence.  *See id.* at ¶¶ 25, 29.  Further, Dr. Silzars does not even attempt to argue that the relevant customer (on whom the acceptability inquiry focuses) would share his unsubstantiated belief.  *See Presidio*, 875 F.3d at 1380 (describing the relevant inquiry as whether the alternative was "acceptable *to potential customers*") (emphasis added).  Dr. Silzars asserts that "[i]n this matter," the relevant "customer is Civiq."  Ex. 31, Silzars NIA Rpt. ¶ 12. As Civiq itself designed and/or sells the ambient-cooled alternatives, it is inexcusable that Dr. Silzars merely assumes that Civiq, as the relevant customer, would share his personal belief that this technology is inferior.  Dr. Silzars's opinion that ambient-cooled products are unacceptable should be excluded because it fails to provide the necessary analysis with reference to the customer, and is also "not supported by reference to any evidence."  *Sonos*, 297 F. Supp. 3d at

---

[18] While Civiq contends Dr. Silzars's personal belief is factually inaccurate, the relevant point for purposes of Civiq's motion to exclude is that Dr. Silzars has provided no supporting evidence.

511–12; *see also Alarm.com, Inc. v. SecureNet Techs. LLC*, C.A. No. 15-807, 2019 WL 133228, at *4–*5 (D. Del. Jan. 8, 2019) (excluding opinions based on "insufficient facts").

**B.      Opinions that Rely on the Incorrect Legal Standard for "Availability" Should be Excluded**

Ms. Bennis's and Dr. Silzars's lost profits opinions as to the availability of non-infringing alternatives apply the wrong law, and therefore should be excluded.

As noted above, a patentee bears the burden to show "the absence of acceptable, non-infringing alternatives" in order to obtain lost profits, either by proving "that the potential alternative was not acceptable . . . or was not available." *Presidio*, 875 F.3d at 1380. "An alternative does not need to be on the market to be available." *Id.* at 1381; *see also Grain Proc. Corp. v. Am. Maize-Prod. Co.*, 185 F.3d 1341, 1351 (Fed. Cir. 1999) ("[A]n available technology not on the market during the infringement can constitute a noninfringing alternative."). Where "the necessary materials, equipment, know-how, and experience" existed "to make an alternative product during the relevant time," the alternative can be "available" even if it was not on sale. *EMC Corp. v. Pure Storage, Inc.*, 154 F. Supp. 3d 81, 117 (D. Del. 2016).

Both Dr. Silzars and Ms. Bennis failed to account for the fact that "a fair and accurate reconstruction of the 'but for' market" in consideration of a lost profits claim can be performed "only by comparing the patented invention to its next-best available alternative(s)—*regardless* of whether the alternative(s) were actually produced and sold during the infringement." *Grain Proc.*, 185 F.3d at 1350–51 (emphasis added). Civiq has presented evidence that those of the alleged alternative products that were not yet being made in the relevant form at the first date of alleged infringement were nonetheless "available." *See, e.g.*, Ex. 32, Eichmann Rpt. ¶¶ 52–56. Yet Dr. Silzars testified that a product must already "exist" in order to be available as a non-infringing alternative. Ex. 33, Silzars Tr. Pt. 2 at 270:15–19. He also opined that a purported

alternative was "not designed; thus not available" at the relevant time.  Ex. 31, Silzars NIA Rpt.

¶ 16.  Ms. Bennis commits the same error, opining in her reply that certain products do not

qualify as non-infringing alternatives because they "were not yet introduced . . . in order to have

been available at the time of first infringement."  Ex. 26, Bennis Reply at 5–6; *see also id* at 8

(opining that products that "were not introduced until May 17, 2016" were therefore "unavailable

until that time").  She testified that she understands only products that were actually

"commercially available" at the time of alleged infringement can qualify as a non-infringing

alternative.  Ex. 27, Bennis Tr. at 131:15–132:3.

Accordingly, both Dr. Silzars and Ms. Bennis fail to offer any opinions regarding the

availability of non-infringing alternatives in the proper context of a "reconstruction of the 'but-

for' market" required.  *Grain Proc.*, 185 F.3d at 1350–51.  Instead, they each look only at the

actual, historical market[19] (which included the alleged infringement), in violation of the Federal

Circuit's unambiguous instruction that an "alternative does not need to be on the market to be

available."  *Presidio*, 875 F.3d at 1381.  The resulting opinions, which are based on erroneous

applications of the law, are not reliable or helpful to the trier of fact and should be excluded.  *See*

*Sprint Commc'ns Co. v. Cox Commc'ns Inc.*, 302 F. Supp. 3d 597, 619 (D. Del. 2017) (excluding

expert testimony under *Daubert* because, *inter alia*, it improperly applied legal principles); *Cave*

*v. Saxon Mortg. Servs., Inc.*, C.A. No. 12-5366, 2015 WL 6153754, at *9 (E.D. Pa. Oct. 20,

2015) (expert opinions based on incorrect law were "*per se* unreliable and inadmissible").

---

[19] Further evidencing this error, Dr. Silzars opined that one alternative was unavailable because
he had "seen no documents or records that Civiq" actually "contemplated" the product "in
2015."  Ex. 31, Silzars NIA ¶ 23.

III.   *DAUBERT* ARGUMENT 3:  THE COURT SHOULD EXCLUDE
       CERTAIN ADDITIONAL TESTIMONY FROM MRI'S TECHNICAL
       EXPERT, DR. SILZARS

   A.    **Dr. Silzars's Opinions Regarding Secondary Considerations
          Should be Excluded**

Dr. Silzars purports to identify secondary considerations of non-obviousness, but since

his opinions merely incorporate an interrogatory response by reference and uncritically repeat

MRI's CEO's personal beliefs, these "opinions" should be excluded.

Setting aside the foundational question of whether an expert may properly incorporate by

reference a party's interrogatory response,[20] Dr. Silzars's opinions on secondary considerations

are too conclusory to constitute proper expert testimony.  His opinions on this subject constitute

three pages of his validity rebuttal, which are repeated in substance across several paragraphs in

his supplemental validity rebuttal.  *See* Ex. 13, Silzars Invalidity Reb. ¶¶ 655–661; Ex. 34,

Silzars Supp. Invalidity Reb. ¶¶ 73–78, 86–88, 141–44, 152–54.  Therein, he purports to identify

"long-felt need," "failure of others," "copying," and "commercial success."  *See id.*

Dr. Silzars does not cite *a single piece* of record evidence that supports the existence of

any specific one of these considerations, instead for the most part providing unsubstantiated

statements with no citations whatsoever.  *See id.*  The only potential "evidence" he identifies to

support these opinions is:  (1) "the background section of the '595 and '322 patents," (2) his

unspecified "understanding" regarding MRI's products since the 2009 timeframe, (3) MRI's

response to Interrogatory 18, (4) "discussions with MRI" (without identifying the person or

people to whom he spoke, let alone when, how often, or about what) and an excerpt from

---

[20] At least one court has concluded that an expert may not do so.  *See Smith v. State Farm Fire & Cas. Co.*, 164 F.R.D. 49, 54 (S.D.W. Va. 1995) (rejecting "Plaintiffs' argument that it is acceptable for experts' reports to incorporate interrogatory answers").

Ms. Bennis's report where she described what she "understand[s] *from Dr. Silzars.*"   *See id.*

(emphasis added).  MRI's experts cannot manufacture an evidentiary basis for their opinions by

respectively pointing back at each other for support, and Dr. Silzars's secondary considerations

opinions are merely "conclusory statements" that "fail[] to provide any analysis of how [they

were] determined" (*Magnetar*, 2014 WL 529983, at \*6) and "constitute the unfiltered

regurgitation of what other people told him."   *XpertUniverse,* 2013 WL 865974, at \*3.  This

much is clear from the fact that at his deposition, Dr. Silzars could not recall MRI's interrogatory

response or having reviewed it.  Ex. 10, Silzars Tr. Pt. 1 at 203:6–206:3, 213:19–214:4.

Furthermore, Dr. Silzars failed to address whether the requisite nexus exists between the

alleged secondary considerations and the asserted claims.  "Evidence of . . . secondary

considerations[] is only significant if there is a nexus between the claimed invention and the"

asserted secondary considerations.  *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311-12

(Fed. Cir. 2006). The "patentee in the first instance bears the burden of coming forward with

evidence sufficient to constitute a prima facie case of the requisite nexus."  *Inventio AG v.

Thyssenkrupp Elevator Corp.*, C.A. No. 08-874, 2014 WL 5786668, at \*8 (D. Del. Nov. 6,

2014).  Dr. Silzars has not even presented any *argument*—let alone evidence—that any one of

the purported secondary considerations he discusses relates specifically to any invention claimed

in any asserted patent.[21]  On this additional basis, Dr. Silzars's secondary considerations opinions

should also be excluded.  *See Magnetar*, 2014 WL 529983, at \*6–\*12 (excluding opinion based

---

[21] To the extent that Dr. Silzars (or MRI's interrogatory response on which he relies), refers
generally to notions such as "outdoor cooling designs," "cooling systems," or "cooling features".
(*see, e.g.*, Ex. 13, Silzars Invalidity Reb. ¶¶ 655–661), none of the asserted claims is directed to
such a broadly-described concept in the abstract.  Rather, each asserted claim covers a *particular*
arrangement of cooling features, and Dr. Silzars's opinions do not describe any nexus between
any one of these specific claimed arrangements and the purported secondary considerations.

on insufficient evidence); *Sonos*, 297 F. Supp. 3d at 511–12 (same); *see also Sprint*, 302 F. Supp. 3d at 619 (excluding opinion failing based on incorrect legal standard).

> **B.     Dr. Silzars's Infringement Opinion as to the Hyundai Products Should be Excluded**

Dr. Silzars's conclusory opinion that the Hyundai IT 55-inch outdoor display product, which Civiq's technical expert identified as a non-infringing alternative, infringes the patents-in-suit is based on a wholly insufficient analysis that should be excluded.[22]

Dr. Silzars sets forth his purported infringement analysis in four sentences, asserting that the Hyundai product uses "two cooling paths in a manner that is similar to the open-loop/closed-loop cooling described in the patents-in-suit." Ex. 31, Silzars NIA Rpt. ¶¶ 31–32. Mere "similarity" does not constitute infringement, and Dr. Silzars makes no attempt to show that the Hyundai product meets *any* single limitation of any patent claim, let alone *all* limitations of any claim. *Id.* While he also provides drawings of the Hyundai IT display (*see id.* at ¶ 30), these are "provided without any explanation of their relevance, what they depict, how the [Hyundai] product meets each claim limitation, and why the pictures demonstrate which or whether each element" is met. *Magnetar*, 2014 WL 529983, at *9. Overall, "[a]ny analytical foundation concerning his reasoning is nonexistent," such that Dr. Silzars's opinion that the Hyundai product is infringing should be excluded as unreliable. *Id.* at *8, *11.

## CONCLUSION

Civiq respectfully requests that the Court grant summary judgment regarding the issues identified above and exclude the above-described expert opinions.

---

[22] Ms. Bennis appears to rely on Dr. Silzars's opinion that the Hyundai product is infringing, and to the extent that his opinion on this subject is excluded, hers should be as well. See Ex. 26, Bennis Reply at 7 ("I understand that any such product . . . may also be found to infringe MRI's patents, and therefore would not constitute a non-infringing alternative to Civiq.").

                                             Respectfully submitted,

                                             /s/ Nathan R. Hoeschen
                                             John W. Shaw (No. 3362)
                                             Karen E. Keller (No. 4489)
                                             Nathan R. Hoeschen (No. 6232)
                                             SHAW KELLER LLP
                                             I.M. Pei Building
                                             1105 North Market Street, 12th Floor
                                             Wilmington, DE 19801
OF COUNSEL:                                  (302) 298-0700
Douglas J. Kline                             jshaw@shawkeller.com
Srikanth K. Reddy                            kkeller@shawkeller.com
Molly R. Grammel                             nhoeschen@shawkeller.com
GOODWIN PROCTER LLP                          Attorneys for Defendants/
100 Northern Avenue                          Counterclaim Plaintiffs
Boston, MA 02210
(617) 570-1209

Naomi L. Birbach
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 459-7374

Yuval H. Marcus
Cameron S. Reuber
Matthew L. Kaufman
Lori L. Cooper
LEASON ELLIS LLP
One Barker Avenue, Fifth Floor
White Plains, NY 10601
(914) 288-0022

Dated: April 22, 2019

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1.1

Undersigned counsel for Defendants hereby certifies that reasonable efforts have been made to resolve the subject of Defendants' motion to exclude certain expert testimony.

*/s/ Nathan R. Hoeschen*

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendants/*
*Counterclaim Plaintiffs*

OF COUNSEL:
Douglas J. Kline
Srikanth K. Reddy
Molly R. Grammel
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1209

Naomi L. Birbach
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 459-7374

Yuval H. Marcus
Cameron S. Reuber
Matthew L. Kaufman
Lori L. Cooper
LEASON ELLIS LLP
One Barker Avenue, Fifth Floor
White Plains, NY 10601
(914) 288-0022

Dated: April 22, 2019

## <u>CERTIFICATE OF SERVICE</u>

I, Nathan R. Hoeschen, hereby certify that on April 22, 2019, this document was served

on the persons listed below in the manner indicated:

**<u>BY EMAIL</u>**

Arthur G. Connolly, III
Ryan P. Newell
Kyle Evans Gay
CONNOLLY GALLAGHER LLP
1201 North Market Street, 20th Floor
Wilmington, DE 19801
(302) 757-7300
aconnolly@connollygallagher.com
rnewell@connollygallagher.com
kgay@connollygallagher.com

Jeffrey S. Standley
James Lee Kwak
F. Michael Speed, Jr.
Beverly A. Marsh
STANDLEY LAW GROUP LLP
6300 Riverside Drive
Dublin, OH 43017
(614) 792-5555
jstandley@standleyllp.com
jkwak@standleyllp.com
mspeed@standleyllp.com
bmarsh@standleyllp.com

*/s/ Nathan R. Hoeschen*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendants/*
*Counterclaim Plaintiffs*