IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MANUFACTURING RESOURCES INTERNATIONAL, INC., | |
| Plaintiff; | |
| v. | Civil Action No. 17-269-RGA |
| CIVIQ SMARTSCAPES, LLC, et al., | |
| Defendants. | |

## MEMORANDUM OPINION

Arthur G. Connolly III, Ryan P. Newell, and Kyle Evans Gay, CONNOLLY GALLAGHER LLP, Wilmington, DE; Jeffrey S. Standley, James Lee Kwak (argued), and F. Michael Speed, Jr. (argued), STANDLEY LAW GROUP LLP, Dublin, OH, attorneys for Plaintiff.

John W. Shaw (argued), Karen E. Keller, David M. Fry, and Nathan R. Hoeschen, SHAW KELLER LLP, Wilmington, DE; Douglas J. Kline (argued), Srikanth K. Reddy (argued), and Molly R. Grammel, GOODWIN PROCTER LLP, Boston, MA; Naomi L. Birbach, GOODWIN PROCTER LLP, New York, NY; Yuval H. Marcus, Cameron S. Reuber, Matthew L. Kaufman, and Lori L. Cooper, LEASON ELLIS LLP, White Plains, NY, attorneys for Defendants.

August 28, 2019



**ANDREWS, U.S. DISTRICT JUDGE:**

Currently pending before the Court are Plaintiff's Motion for Summary Judgment and Daubert Motion (D.I. 207) and Defendants' Motion for Partial Summary Judgment and Daubert Motion. (D.I. 202). The parties have fully briefed the issues. (D.I. 203, 212, 239, 240, 247, 252). I heard helpful oral argument on August 22, 2019. (Hr'g Tr.).

## I.   BACKGROUND

Plaintiff Manufacturing Resources International, Inc. filed suit against Defendants Civiq Holdings, Civiq Smartscapes, Comark Holdings, and Comark on March 14, 2017 alleging infringement of seventeen patents.[1] (D.I. 1 ¶ 144). Defendants counterclaimed. (D.I. 18). Both parties have amended their claims. (D.I. 84, 101). The parties completed fact discovery on November 30, 2018 and expert discovery on April 5, 2019. (D.I. 163). Trial is scheduled to begin on September 9, 2019. (D.I. 26).

The patent claims remaining in the case are claim 1 of U.S. Patent No. 8,854,595 ("the '595 Patent"), claims 8, 11, and 14-15 of U.S Patent No. 8,854,572 ("the '572 Patent"), claims 2 and 6 of U.S. Patent No. 8,773,633 ("the '633 patent"), claim 18 of U.S. Patent No. 9,629,287 ("the '287 patent"), and claims 1 and 2 of the U.S. Patent No. 9,173,325 ("the '325 patent"). (D.I. 212 at 3; D.I. 264).

Plaintiff has now moved for summary judgment of (1) direct infringement of claim 1 of the '595 patent, claims 2 and 6 of the '633 patent, and claims 1 and 2 of the '325 patent; (2) induced infringement of claims 8, 11, and 14-15 of the '572 patent; (3) no inequitable conduct; and (4) on Defendants' Lanham Act and Delaware Deceptive Trade Practice counterclaims. (D.I. 212 at 2-

---

[1] U.S. Patent Nos. 8,854,595, 9,173,322, 8,767,165, 8,274,622, 8,482,695, 8,854,572, 9,089,079, 8,373,841, 8,351,014, 9,030,129, 9,167,655, 8,125,163, 8,829,815, 9,313,917, 8,497,972, 8,016,452, and 9,448,569. (D.I. 1 ¶ 144).

3). Defendants have moved for partial summary judgment of (1) noninfringement of the '325 patent; (2) invalidity for lack of written description for the '287 patent claims; and (3) no pre-suit damages for any of the asserted patents. (D.I. 203 at 1).

## II.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1).

2

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247–49. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

## III. DISCUSSION

### A. Infringement of the '325 Patent

The parties have both moved for summary judgment on infringement of claims 1-2 of the '325 patent. (D.I. 203 at 8; D.I. 212 at 24). The parties agree that there is no dispute of material fact as to how the Accused Link Kiosk operates for the purposes of determining infringement of claims 1 and 2 of the '325 patent. (D.I. 203 at 9; D.I. 212 at 26). However, the parties dispute whether the following claim limitation is met: "a circulating fan assembly positioned to force circulating gas through the first gaseous loop, second gaseous loop, and heat exchanger." (D.I. 212 at 25). The parties' central dispute appears to be the scope of the claim term "circulating fan assembly." (D.I. 203 at 8; D.I. 212 at 25; D.I. 239 at 17). The term "circulating fan assembly" was not identified in the parties' claim construction briefing, and therefore has not yet been construed. (D.I. 94-1; D.I. 124). Thus, I must construe the claim term before the question of infringement can be resolved. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute.").

3

### 1. Claim Construction

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted). "'[T]here is no magic formula or catechism for conducting claim construction.' Instead, the court is free to attach the appropriate weight to appropriate sources 'in light of the statutes and policies that inform patent law.'" *SoftView LLC v. Apple Inc.*, 2013 WL 4758195, at *1 (D. Del. Sept. 4, 2013) (quoting *Phillips*, 415 F.3d at 1324) (alteration in original). When construing patent claims, a court considers the literal language of the claim, the patent specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977–80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Of these sources, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal quotation marks omitted).

"[T]he words of a claim are generally given their ordinary and customary meaning. . . . [Which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312–13 (citations and internal quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to [an] ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

When a court relies solely upon the intrinsic evidence—the patent claims, the specification, and the prosecution history—the court's construction is a determination of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). The court may also make factual findings based upon consideration of extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317–19 (internal quotation marks omitted). Extrinsic evidence may assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art, and how the invention works. *Id.* Extrinsic evidence, however, is less reliable and less useful in claim construction than the patent and its prosecution history. *Id.*

"A claim construction is persuasive, not because it follows a certain rule, but because it defines terms in the context of the whole patent." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GMBH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (citation and internal quotation marks omitted).

Claim 1 of the '325 patent reads as follows:

1. An electronic display assembly comprising:

   a first and second electronic image assembly where the two image assemblies are positioned back to back;

   a first closed gaseous loop encircling the first image assembly;

   a second closed gaseous loop encircling the second image assembly;

   a heat exchanger placed within the path of both the first and second closed gaseous loops;

   a *circulating fan assembly* positioned to force circulating gas through the first gaseous loop, second gaseous loop, and heat exchanger; and

   an open loop fan which forces ambient air through the heat exchanger;

   wherein the ambient air is not permitted to mix with the circulating gas.

('325 patent, cl. 1 (disputed term italicized)).

Plaintiff asserts that the plain and ordinary meaning of the claim term "circulating fan assembly" may read on an apparatus where one or more "circulating fan assembl[ies]" are required to circulate gas through the two loops and the heat exchanger. (D.I. 212 at 25). Alternatively, Plaintiff argues that the term "assembly" is sufficiently broad to cover subassemblies that are electrically connected and commonly controlled. (*Id.* at 26). Defendants assert that the "circulating fan assembly" must force the gas through a single unitary pathway that is defined by "the first gaseous loop, second gaseous loop, and heat exchanger." (D.I. 203 at 8-9; D.I. 239 at 18-20).

**First**, Plaintiff is incorrect that the combination of a "comprising" claim and the use of the indefinite article "a" or "an" broadens the scope of the term "circulating fan assembly."[2] Thus, the use of "comprising" can not abrogate the requirement that there must be at least one "circulating fan assembly" that is "positioned to force circulating gas through" each of "the first gaseous loop, [the] second gaseous loop, and [the] heat exchanger." *See Spectrum Int'l Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1380 (Fed. Cir. 1998); *Outside the Box Innovations, LLC v. Travel Caddt, Inc.*, 695 F.3d 1285, 1305 (Fed. Cir. 2012).

**Second**, Plaintiff asserts that "assembly" is sufficiently broad to encompass subassemblies that are electrically connected and commonly controlled. (D.I. 212 at 26). The specification repeatedly uses the term "assembly" in accordance with its ordinary meaning, "a unit consisting of components that have been fitted together." ('325 patent, col. 3-9); *Assembly*, OXFORD DICTIONARY ONLINE (August 26, 2019). Thus, the term "circulating fan assembly" should be

---

[2] The parties agree that "a" means one or more. (D.I. 240 at 4; Hr'g Tr. at 72:6-9).

interpreted broadly to mean "a collection of connected fans that are operable together" and meet the remainder of the claim limitation.

Defendants assert that the claim term should be read to require the "circulating fan assembly" to be positioned to force gas through a single unitary pathway defined by "the first gaseous loop, second gaseous loop, and heat exchanger." To support this claim construction, Defendants point to the figures in the patent. (Hr'g Tr. at 75:12-76:21). However, the figures are merely exemplary embodiments and should not be interpreted to limit the explicit claim language. The claim language refers to two closed loop paths. ('325 patent, cl. 1; *id.* at col. 4:56-59; col. 7:32-39). Additionally, claim 6 of the '325 patent claims a singular "closed loop of circulating gas which encircles both the first and second electronic image assemblies" (*id.*, cl. 6); this further indicates that the language of claim 1 requires two *individual* closed loops, rather than a single unitary path. Thus, the "circulating fan assembly" must circulate gas through the first gaseous loop, second gaseous loop, and heat exchanger, but the claim language does not require that the first and second loops be connected, nor that all of the circulating gas enter all three elements. Defendants' interpretation also improperly narrows the meaning of "circulating fan assembly" to "circulating fan." It is the fan *assembly* that must be "positioned to force circulating gas through the first gaseous loop, second gaseous loop, and heat exchanger," not each single fan within the assembly. The specification also makes clear that the positioning and orientation of the various loops and fan assemblies are flexible. ('325 patent, col. 3:38-44, col. 5:8-3, 49-54, col. 8:63-9:5). Defendants' interpretation of the claim language would constrain the positioning and orientation of the circulating fan assembly in a way that is contrary to this broad language in the specification.

Thus, I will construe the claim limitation "circulating fan assembly positioned to force circulating gas through the first gaseous loop, second gaseous loop, and heat exchanger" consistent

with the plain and ordinary meaning of the claim language, that is "a collection of connected fans that are operable together, positioned to circulate gas through the first gaseous loop, the second gaseous loop, and the heat exchanger."

### 2. Infringement by the Accused Link Kiosk

The only remaining question is thus whether the undisputed arrangement and operation of the Accused Link Kiosk satisfies the claim limitation. The parties agree that there are no disputes on the remainder of the limitations in claims 1 and 2 of the '325 patent. (D.I. 203 at 8-10; D.I. 212 at 25). Defendants assert that even under the claim, as construed, summary judgment of literal infringement cannot be granted because it collapses two claim elements into one. (D.I. 203 at 9-10). Specifically, Defendants argue that Plaintiff's theory of infringement (that the "circulating fan assembly" limitation is satisfied by two fan banks connected and controlled by the same electrical components) means that the "open loop fan" is subsumed into the "circulating fan assembly" because the open loop fan is also controlled by the same electrical component. (*Id.*).

I disagree. The specification contemplates that the open loop fan can be placed anywhere in the invention so long as it "forces ambient air through the heat exchanger." ('325 patent, cl. 1; *id.* at col. 5:21-26). Moreover, the specification states that the heat exchanger may be cross-flow, parallel flow, or counter-flow (*id.* at col. 5:53-54), and thus that the open loop fan and circulating fan assembly may be directing the ambient and closed loop air in the same direction. Defendants' reliance on *Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249 (Fed. Cir. 2010) is misplaced. There, the claim's language specifically contemplated "a spring means *connected to* said hinged arm" (emphasis added), clearly indicating that a "spring means" and "hinged arm" are separate elements in the invention from one another. *Id.* at 1253-54. Here, the claim language does not define the relationship between the open loop fan and the circulating fan

assembly limitations. The claim language defines these components by the function that they must complete. ('325 patent, cl. 1). Additionally, the difference in claim language—"fan" versus "fan assembly"—indicates that the "open loop fan" could be included in the "circulating fan assembly" (which can include more than one fan). As long as the overall assembly meets the remainder of the claim limitation and there is an individual fan that meets the "open loop fan" limitation, both claim limitations can be met by a product where the open loop fan is connected to or part of the circulating fan assembly.

There is no dispute that the fan banks positioned at the bottom of the display assemblies are connected by an electrical component, are commonly controlled, and that together they are "positioned to circulate air through the first closed gaseous loop, the second gaseous loop, and the heat exchanger." Nor is there any dispute that there is at least one fan which "forces ambient air through the heat exchanger." (D.I. 219, Ex. I, ¶¶ 48-55). Thus, as a matter of law, claims 1 and 2 of the '325 are literally infringed by the Accused Products. I will therefore grant summary judgment in favor of Plaintiff on these claims.

### B. Infringement of the '595 patent

Plaintiff moves for summary judgment that Defendants infringe claim 1 of the '595 patent. (D.I. 212 at 17). Claim 1 of the '595 patent reads as follows:

1. A system for cooling an electronic display having a posterior display surface and contained within a housing, the system comprising:

   a constricted convection plate placed posterior to the posterior display surface;

   two side panels placed adjacent to the constricted convection plate and the posterior display surface, defining a constricted convection channel having an entrance and an exit; and

   a fan placed to draw air from outside of the housing through the constricted convection channel.

('595 patent, cl. 1). The parties' dispute centers on whether the accused product has a "constricted convection channel," which I have construed to mean "constricted channel through which air may flow to remove heat from the posterior display surface." (D.I. 153 at 2). Plaintiff argues that there is no genuine dispute of material fact as to how the accused product operates as Defendants' noninfringement argument relies on a previously rejected claim construction. (D.I. 212 at 17-19). Defendants argue that there is a genuine dispute of material fact as to whether "any heat transfer is actually taking place between the relevant components" when there are intervening components. (D.I. 239 at 9).

I agree with Defendants that a genuine dispute of material fact prevents summary judgment of infringement of the '595 patent. Dr. Blonder has provided an opinion that "the air removes heat from the ribbed heat sink and not the posterior display surface." (D.I. 205, Ex. 5 ¶ 73). I do not understand Dr. Blonder's testimony to contradict my construction of "constricted convection channel" as a "constricted channel through which air may flow to remove heat from the posterior display surface." (D.I. 153 at 2). Moreover, Dr. Silzars' own invalidity report states that "the location of the constricted convection plate . . . is selected so that an airflow through the resulting constricted convection channel will travel substantially along the posterior surface of the display." (D.I. 208, Ex. 13 ¶ 113). This testimony could be taken by a reasonable juror to be inconsistent with Dr. Silzars' infringement opinion that infringement occurs where other elements transfer heat from the posterior display surface to the ambient air. (D.I. 206, Ex. 8 ¶¶ 37, 40). Taking the evidence in the light most favorable to Defendants, as I am required to do, I determine that a reasonable jury could conclude that the accused product does not infringe. Thus, I will deny summary judgment of infringement of claim 1 of the '595 patent.

## C. Infringement of the '633 patent

Plaintiff is asserting dependent claims 2 and 6 of the '633 patent against Defendants. The claims read as follows:

> 1. A system for cooling components in an electronic display comprising:
>
> a thermally conductive plate having a surface area;
>
> a component having a footprint smaller than the surface area of the plate and placed in thermal communication with the plate; and
>
> a plurality of ribs in thermal communication with the plate;
>
> wherein the plate provides a gaseous and contaminate barrier between the ribs and the component.
>
> 2. The cooling system of claim 1 further comprising:
> a fan positioned to draw cooling air along the ribs.
>
> 6. The cooling system of claim 1 wherein:
> the ribs have a hollow rectangular cross-section.

('633 patent, cls. 1, 2, 6). I have construed "plurality of ribs in thermal communication with the plate" to mean "plurality of ribs capable of thermal communication with the plate." (D.I. 153 at 2). Plaintiff asserts that summary judgment of infringement of the '633 patent is appropriate because there is no genuine dispute of material fact as to whether the "in thermal communication" limitation is met. (D.I. 212 at 19-20). Plaintiff asserts that Defendants' expert admitted that the limitation is met by the accused device. (*Id.* at 21). Defendants argue that Plaintiff has "not presented sufficient evidence that the alleged ribs are in thermal communication with the alleged plate as a matter of law." (D.I. 239 at 11).

I agree with Defendants that there are genuine disputes of material fact preventing summary judgment. Taking the evidence in the light most favorable to Defendants, as I am required to do, it does not require a reasonable jury to find infringement of the '633 patent. Dr. Silzars' statement that "[t]he plurality of ribs are capable of thermally communicating with the cover plate of the Link device" does not explain how such thermal communication could occur.

11

(D.I. 220, Ex. N ¶ 23). Such conclusory testimony cannot support a finding of infringement. A jury could reasonably find that the ribs are not capable of thermal communication with the cover plate, given Dr. Blonder's testimony that the "plate is attached with a non-thermally conducting double sticky tape which would form a barrier to heat flow." (D.I. 220, Ex. AA at 100:3-5).[3] Thus, because a reasonable jury could find that the accused product does not infringe, I will deny Plaintiff's motion for summary judgment of infringement of the '633 patent.

### D. Induced Infringement of the '572 patent

Plaintiff asks for summary judgment of induced infringement of the asserted claims of the

'572 patent. The asserted claims read as follows:

8. A method for cooling an electronic display having a front surface and a gap defined between a rear surface of the electronic display and a second posterior surface, comprising the steps of:

circulating gas around the display in a closed loop;

allowing the gas to contact the front surface of the electronic display; and

forcing cooling air through the gap

where the cooling air is not permitted to mix with the circulating gas.

11. The method of claim 8 wherein:

said gap is between 0.25 and 1.25 inches.

14. The method of claim 8 wherein:

said step of forcing cooling air through said gap is performed by a fan which pushes gas through the gap.

15. The method of claim 8 further comprising the step of:

filtering the cooling air prior to forcing it through said gap.

('572 patent, cl. 8, 11, 14-15).

---

[3] While Plaintiff characterizes portions of Dr. Blonder's testimony as an admission that the ribbed heat sink is capable of thermal communication with the plate (D.I. 212 at 21), I do not believe that Plaintiff has presented affirmative evidence at this stage to warrant a grant of summary judgment.

Plaintiff argues that there is no dispute that (1) Defendants' customers directly infringe the '572 patent when they operate the accused products and (2) the accused products cannot be used in a noninfringing manner. (D.I. 212 at 21-24). Defendants argue that (1) Plaintiff has not met its burden of proof and (2) there is a genuine dispute of material fact as to whether the '572 patent would be infringed by merely installing the accused kiosks. (D.I. 239 at 13).

Plaintiff argues that Defendants have no genuine dispute of fact that their customers directly infringe the asserted claims of the '572 patent. (D.I. 212 at 21-22). Defendants do not appear to dispute this. (D.I. 239 at 13-14). However, Defendants assert that Plaintiff has not presented facts to support a finding of the required intent for induced infringement. (*Id.* at 13).

Section 271(b) provides, "Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). Liability for inducement may only arise if there is direct infringement. *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 921 (2014). To succeed on a claim of induced infringement, the patentee must show that "the alleged infringer possessed the requisite intent to induce infringement." *Barry v. Medtronic, Inc.*, 914 F.3d 1310, 1334 (Fed. Cir. 2019). "The intent requirement for inducement requires more than just intent to cause the acts that produce direct infringement." *DSU*, 471 F.3d at 1306. As a prerequisite to showing intent, "a defendant must know the acts constitute patent infringement." *Commil USA, LLC v. Cisco Systems*, 135 S. Ct. 1920, 1928 (2015); *see also Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011) ("induced infringement . . . requires knowledge that the induced acts constitute patent infringement").[4] "[I]nducement requires evidence of culpable conduct,

---

[4] The parties cite to language from *DSU* and *Barry* stating that intent may be found where the patentee can show "that the alleged infringer knew or should have known his actions would induce actual infringements." *DSU*, 471 F.3d at 1306; (D.I. 212 at 22 (quoting *Barry*, 914 F.3d at 1334); D.I. 239 at 15 (discussing cases)). This cannot be squared with the Supreme Court's language in *Global-Tech*. requiring knowledge or "willful blindness" for induced infringement. 563 U.S. at 766. The Supreme Court rejected a finding of induced infringement under the "deliberate indifference" standard because it permitted "a finding of knowledge where there is merely a 'known risk' that the induced acts are infringing." *Id.* at 770. Willful blindness requires substantially more than that a patentee "should

13

directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *Id.*

> Circumstantial evidence can support a finding of specific intent to induce infringement. Inducement can be found where there is evidence of active steps taken to encourage direct infringement, which can in turn be found in advertising an infringing use or instructing how to engage in an infringing use. Direct infringement and inducement are issues of fact.

*Barry*, 914 F.3d at 1334 (cleaned up). "[S]pecific intent may be inferred from circumstantial evidence where a defendant has both knowledge of the patent and specific intent to cause the acts constituting infringement." *Sanofi v. Glenmark Pharm. Inc.*, 204 F. Supp. 3d 665, 673 (D. Del. 2016).

Plaintiff asserts that it is undisputed that Defendants "induce[] infringement by providing the Link device to customers and encouraging and instructing [] customers to install and use the Link device as it was intended to be used." (D.I. 212 at 23). Further, Plaintiff asserts that Defendants "knew or should have known that these acts would cause [] customers to infringe, because [Defendants] had knowledge of [the] '572 patent . . . and because they had specific intent for [] customers to use the internal cooling systems of the Link display." (*Id.* at 24). Defendants assert that Plaintiff has not put forward evidence that Defendants had pre-suit knowledge of the '572 patent. (D.I. 238 at 16-17).

I do not believe that this evidence, taken in the light most favorable to Defendants, supports a finding of induced infringement as a matter of law. Specifically, while there is circumstantial evidence from which a jury could infer specific intent to induce, a reasonable jury could equally discount this evidence. Additionally, there are clear disputes of fact as to Defendants' knowledge of the '572 patent. Thus, there are genuine disputes of material fact that should be resolved by the

---

have known" the induced acts were infringing. It requires that the accused infringer "subjectively believe there is a high probability" that the acts are infringing and takes "deliberate actions to avoid learning of that fact." *Id.* at 769.

factfinder. I will therefore deny Plaintiff's motion for summary judgment of induced infringement of the asserted claims of the '572 patent.

### E. Written Description of the '287 Patent

Defendants assert that summary judgment of invalidity for lack of written description should be entered for the '287 patent because "the patent specification lacks any written description of the claimed 'rear cooling chamber . . . containing an electrical component which is electrically connected to the electronic display.'" (D.I. 203 at 10). Plaintiff asserts that the written description requirement is fulfilled because the claim limitation was present in the originally filed claims, which are part of the written description. (D.I. 240 at 6-7).

The written description requirement contained in 35 U.S.C. § 112, ¶ 1 requires that the specification "clearly allow persons of ordinary skill in the art to recognize that the inventor invented what is claimed." *Ariad Pharm., Inc., v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (cleaned up). "In other words, the test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Id.* The written description inquiry is a question of fact. *See id.* Although it is a question of fact, "[c]ompliance with the written description requirement . . . is amenable to summary judgment in cases where no reasonable fact finder could return a verdict for the non-moving party." *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008). "A party must prove invalidity for lack of written description by clear and convincing evidence." *Vasudevan Software, Inc. v. MicroStrategy, Inc.*, 782 F.3d 671, 682 (Fed. Cir. 2015).

"Original claims are part of the original specification and in many cases will satisfy the written description requirement." *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1297

15

(Fed. Cir. 2017). As in *Mentor Graphics*, the very language that Defendants allege is "not supported by the specification was present in the originally-filed claims" and "[t]he claims at issue in this case are indistinguishable from other cases relying on originally-filed claims to satisfy the written description requirement." *Id.* Original claim 18 recites "a rear cooling chamber positioned behind the electronic display and containing an electrical component which is electrically connected to the electronic display." (D.I. 242 at 22). The Federal Circuit in *ScriptPro LLC v. Innovation Assocs., Inc.*, 833 F.3d 1336, 1341 (Fed. Cir. 2016), stated:

> [A] specification's focus on one particular embodiment or purpose cannot limit the described invention where that specification expressly contemplates other embodiments or purposes. This is especially true in cases such as this, where the originally filed claims are not limited to the embodiment . . . that is the focus of the specification.

The same is true here. Thus, at a minimum, there is a genuine dispute of material of fact as to whether the language of the original claims provides sufficient written description support for the asserted claims of the '287 patent. Therefore, I will deny Defendants' motion for summary judgment of lack of written description for the '287 patent.

## F. Inequitable Conduct

Defendants have asserted inequitable conduct as an affirmative defense. (D.I. 101 ¶¶ 237-40, 314-17). Defendants premise their inequitable conduct defense on the allegation that the named inventor of the '595 and '322 patents, Mr. Dunn, misrepresented the inventorship. (*Id.*). Specifically, Defendants allege that Mr. Bolton and/or Mr. Gavel conceived of specific contributions to the inventions claimed. (*Id.*). Plaintiff argues summary judgment of no inequitable conduct should be granted because Defendants cannot show that an intent to deceive is the only reasonable inference to draw from the evidence. (D.I. 212 at 27).

To show inequitable conduct, an accused infringer must generally show (1) "that the patentee acted with the specific intent to deceive the PTO" and (2) that "but for" the misrepresentation, the patent would not have issued. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed.Cir.2011) (en banc). There is no dispute that misrepresentations of inventorship are material. *See PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1321 (Fed. Cir. 2000) ("As a critical requirement for obtaining a patent, inventorship is material."). Intent may be inferred "from indirect and circumstantial evidence." *Id.* "[T]o meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Id.* (quoting *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)).

There are significant disputes of material fact on both prongs of the test for inequitable conduct. There is an underlying factual dispute as to whether the inventorship of the patents has been misrepresented. Additionally, there is a material dispute of fact on deceptive intent; Defendants have put forward affirmative circumstantial evidence of intent to deceive through its expert, Mr. Sharp. (D.I. 208, Ex. 12 ¶¶ 340-55, 385-87).

While the burden of proving intent is a heavy one, I cannot conclude as a matter of law that Defendants cannot show that Mr. Dunn intended to deceive the PTO. Therefore, Plaintiff's motion for summary judgment is denied with respect to inequitable conduct.

### G. Pre-Notice Damages

Defendants request summary judgment of no pre-notice damages for the '595, '287, '325 and '633 patents because Plaintiff cannot satisfy its burden of proof that it complied with the marking statute and did not otherwise provide actual pre-suit notice of infringement. (D.I. 203 at 12). Plaintiff opposes the motion for summary judgment as to pre-notice damages for the '633

and '595 patents but admits that it did not begin marking products covered by the '325 and '287 patents until after it provided actual notice to Defendants by filing notice of its intention to amend the Complaint. (*Id.* at 16; D.I. 240 at 8 n.5). Thus, I will grant summary judgment of no pre-suit damages for the '325 and '287 patent.

Defendants' argument that Plaintiff has not proven it has met its marking obligation for the '595 and '633 patents is two-fold. First, Defendant argues that Plaintiff cannot establish that it marked "substantially all" of its products. (D.I. 203 at 12). Second, Defendant asserts that Plaintiff has not satisfied the "association" requirement of the marking statute. (*Id.* at 14-15). Plaintiff asserts that it has provided evidence that it has continuously marked substantially all of its patented products by labeling them with the word "patent" and an address to a website that associates the patented article with the patent number(s). (D.I. 240 at 8-11).

35 U.S.C. § 287 provides,

Patentees . . . may give notice to the public that the same is patented . . . by fixing thereon the word "patent" or the abbreviation "pat." together with an address of a posting on the Internet, accessible to the public without charge for accessing the address, that associates the patented article with the number of the patent. . . . In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

Plaintiff has produced evidence showing that the accused products have been marked "by fixing thereon the word 'patent' . . . together with the address of a posting on the Internet." 35 U.S.C. § 287. Plaintiff has produced sample product patent marking labels and a declaration under oath that "[s]ince at least as early as 2013, [Plaintiff] has consistently and continuously marked substantially all of its patented products" through virtual marking, and "[e]very BoldVu display manufactured by [Plaintiff] since at least as early as 2013" has been virtually marked. (D.I. 241,

Ex. GGGG ¶¶ 7-8). This evidence is sufficient to survive summary judgment when the patentee engages in physical marking. *See Sentry Protection Prods, Inc. v. Eagle Mf'g Co.*, 400 F.3d 910, 918 (Fed. Cir. 2005).

Defendants, however, challenge the sufficiency of the association on Plaintiff's website under the marking statute. Defendants argue that the website does not sufficiently "associate[] the patented article with the number of the patent" under the marking statute. (D.I. 203 at 14). Plaintiff argues that the website satisfies the association requirement because the website labels the listed patents as "LCD display patents" and states, "one or more of the above listed MRI patents may be used by LG-MRI products under license from MRI, Inc." (D.I. 240 at 10). The parties' dispute centers on what § 287 requires where it states that "of a posting on the Internet, accessible to the public without charge for accessing the address, that associates the patented article with the number of the patent."

Section 287 creates a notice requirement for a patentee to receive damages for infringement. "The notice requirement is designed for the information of the public and provides a ready means of discerning the status of the intellectual property embodied in an article of manufacture or design." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 162 (1989). "In determining whether the patentee marked its products sufficiently to comply with the constructive notice requirement, the focus is not on what the infringer actually knew, but on whether the patentee's actions were sufficient, in the circumstances, to provide notice *in rem*." *Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1446 (Fed. Cir. 1998). The virtual marking requirement was intended to provide such notice in a manner commensurate with the notice provided by physical marking.[5]

---

[5] The USPTO prepared a report to Congress in 2014 on virtual marking. *See* Report to Congress on Virtual Marking, September 2014, https://www.uspto.gov/sites/default/files/aia_implementation/VMreport.pdf. The report notes,

The plain language of the marking statute requires that the website (the "internet posting") "*associate*[] the patented article with the number of the patent." 35 U.S.C. § 287 (emphasis added). A patentee may not rely on the mere fact that the product is marked with the website for "association"; the statute is clear that it is the function of the website to associate the patent and the patented article. This requirement ensures that virtual marking provides a level of notice commensurate with that of physical marking—the product is associated with the patent, even where a patentee may use a single website to mark multiple products. Mere direction to a general website listing patents for all the patentee's products does not create this same association. Additionally, permitting such a practice would likely create issues under the false marking statute if association could be inferred solely from marking the product with the website address. *See* 35 U.S.C. § 292; *Clontech Labs., Inc. v. Invitrogen Corp.*, 406 F.3d 1347, 1352 (Fed. Cir. 2005) ("When the statute refers to an 'unpatented article' the statute means that the article in question is not covered by at least one claim of each patent with which the article is marked."). Thus, it is clear from the plain language of the statute itself and related statutes that the website itself must do more than simply list the patentee's patents. Simply listing all patents that could possibly apply to a product or all patents owned by the patentee on the patentee's marking website does not give the public notice. It merely creates a research project for the public.

Plaintiff has submitted various iterations of its marking website. (D.I. 242, Ex. EEEE). One such iteration lists 94 patents, with 77 of those being United States patents, but makes no reference to specific LG-MRI products. (*Id.* at 193-202). At the bottom of the list of patents in this iteration, the website states, "One or more of the above listed MRI patents may be used by

---

"According to the legislative history of the AIA, Congress intended the virtual marking amendment to save costs for manufacturers and to facilitate effective marking of small products." *Id.* at 1. Neither motivation indicates that Congress intended to decrease the notice provided by marking, either physical or virtual.

LG-MRI products under license from MRI, Inc." (D.I. 242 at 202). Other iterations of the website merely title the patent list with "MRI LCD Display Patents" with no mention of products. (*Id.* at 166-86).

Here, Plaintiff's website does nothing to "associate" any specific product it has marked with the patents which cover it. While the website clarifies the patent category (LCD Display Patents), it does not mention a single specific patented article by product number or product name (e.g., CoolVu, BoldVu). (*Id.* at 153-257). Thus, the website does nothing to "associate" any of 112 patents with any of the 46 identified covered products; it does not provide "a ready means of discerning the status of the intellectual property embodied in an article of manufacture or design." *Bonito Boats*, 489 U.S. at 162. This is insufficient as a matter of law to meet the requirements of virtual marking under § 287. Thus, I will grant Defendants' Motion for Summary Judgment of no pre-suit damages for all patents, including the '633 patent and '595 patent.

### H. Lanham Act / DDTP Counterclaims

Defendants have counterclaims under the Lanham Act and the Delaware Deceptive Trade Practice Statute. (D.I. 101 ¶¶ 453-611). Defendants' counterclaims are for false designation of origin and unfair competition. (*Id.*). The counterclaims are based upon Plaintiff's purported use of a copyrighted rendering of Defendants' Waypoint kiosk product that depicted the Waypoint trade dress to misleadingly advertise MRI's own products. (*Id.*). Plaintiff moves for summary judgment based on insufficient evidence of distinctive trade dress or likelihood of confusion. (D.I. 212 at 32). Defendants assert that there are genuine disputes of material fact preventing summary judgment. (D.I. 239 at 26).

The parties appear to agree on the legal requirements for such claims under the Lanham Act. (D.I. 212 at 32; D.I. 239 at 27). To establish a claim under the Lanham Act based upon an unregistered trade dress, the plaintiff must prove (1) that the infringing trade dress is nonfunctional, (2) that the trade dress is inherently distinctive or has acquired secondary meaning/distinctiveness, and (3) that unauthorized use is likely to cause consumer confusion. *Rose Art. Indus. v. Swanson*, 235 F.3d 165, 171 (3d Cir. 2000); *Keurig, Inc. v. Sturm Foods, Inc.*, 2012 WL 4049799, at ¶ 10 (D. Del. Sept. 13, 2012). The parties also agree that the DDTP claim does not need to be separately analyzed. (D.I. 212 at 33; D.I. 239 at 27).

Plaintiff does not contest that the allegedly infringing trade dress is nonfunctional but asserts that Defendants have not produced sufficient evidence of distinctiveness or likelihood of confusion. (D.I. 212 at 32-33). Whether there is a secondary meaning or likelihood of confusion are questions of fact. *Dranoff-Perlstein Assocs. v. Sklar*, 967 F.2d 852, 862 (3d Cir. 1992). "When the primary significance of the trade dress to a consumer is in designating not the product but its producer, the trade dress has acquired secondary meaning." *Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78, 82 (3d Cir. 1982). Courts may consider "factors such as length of use, buyer association, extent of sales and advertising, and the fact of copying" in assessing secondary meaning. *Id.* In determining whether trade dress creates likelihood of confusion, courts should look to a variety of factors, including "the degree of similarity" in the trade dress, "intent of the defendant in adopting its trade dress," and "evidence of actual confusion." *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 11 F.3d 350, 358 (3d Cir. 2007).

Defendants have cited to circumstantial evidence of both secondary meaning and consumer confusion. (D.I. 239 at 29-30 (presenting evidence of copying, length of use, actual confusion, and trade dress similarity)). A reasonable jury, taking this evidence in the light most favorable to

Defendants, could conclude that Defendants' trade dress had acquired secondary meaning and Plaintiff's use of the trade dress created a likelihood of confusion in the market. Thus, the evidence is sufficient to create a genuine dispute of material fact on the Lanham Act and Delaware Deceptive Trade Practice counterclaims. Therefore, I will deny Plaintiff's motion for summary judgment as to Defendants' Lanham Act and DDTP counterclaims.

### I. Damages Under the Lanham Act, DDTP, and the Copyright Act

Plaintiff requests summary judgment of no statutory and monetary damages for Defendants' false designation of origin, copyright infringement, and unfair competition counterclaims. (D.I. 212 at 33-34). At oral argument, Defendants stated that they are not seeking any monetary damages for these counterclaims. (Hr'g Tr. at 59:12-14, 61:18-20). Thus, I will dismiss Plaintiff's motion for summary judgment of no damages as moot.

### IV. CONCLUSION

For the foregoing reasons, I grant Plaintiff's motion for summary judgment of infringement of the '325 patent, dismiss Plaintiff's motion for summary judgment of no damages under the Lanham/DDTP/Copyright Act as moot, and deny the remainder of Plaintiff's summary judgment motion. Plaintiff's *Daubert* motion is reserved.

I grant Defendants' motion for summary judgment of no pre-notice damages on the four remaining patents and deny the remainder of Defendants' summary judgment motion. Defendants' *Daubert* motions are reserved.

An accompanying order will be entered.